# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
HERBERT ST. CLAIRE CRICHLOW,         )
)      Civil Action No. 07-01622 (HHK)
       Plaintiff,        )
)
       v.            )
)
WARNER MUSIC GROUP CORP.,      )
)
       Defendant.     )
_____ )

## MOTION BY DEFENDANT WARNER MUSIC
## GROUP CORP. TO DISMISS THE COMPLAINT

Pursuant to Federal Rule of Civil Procedure 12(b)(2), Federal Rule of Civil Procedure 12(b)(3), and forum non conveniens, Defendant Warner Music Group Corp. hereby moves to dismiss this action (i) for lack of personal jurisdiction, (ii) for improper venue due to a contractual forum selection clause mandating litigation of this dispute in the High Court of London and (iii) because Washington, D.C. is an inconvenient and inappropriate forum in that it has no connection to the underlying dispute and is not home to any of the relevant witnesses or documents.

Pursuant to Local Rule LCvR 7, attached to this Motion to Dismiss are (i) a Statement of Points and Authorities in Support of Motion by Defendant Warner Music Group Corp. to Dismiss the Complaint, (ii) Declaration of Paul M. Robinson, (iii) Declaration of Jane Dyball, and (iv) a Proposed Order.

Dated:  September 20, 2007                    Respectfully submitted,

                                              JENNER & BLOCK LLP

                                              By:    /s/ Steven B. Fabrizio
                                                     Steven B. Fabrizio (DC Bar 436482)
                                                     601 Thirteenth Street, NW
                                                     Suite 1200 South
                                                     Washington, DC 20005
                                                     (202) 639-6000

                                              *Attorney for Defendant Warner Music
                                              Group Corp.*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                                    )
HERBERT ST. CLAIRE CRICHLOW,        )
                                    )
        Plaintiff,                  )
                                    )         Civil Action No. 07-01622 (HHK)
        v.                          )
                                    )
WARNER MUSIC GROUP CORP.,           )
                                    )
        Defendant.                  )
_____)


## STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION BY DEFENDANT WARNER MUSIC GROUP CORP. TO DISMISS THE COMPLAINT


Steven B. Fabrizio (DC Bar 436482)
JENNER & BLOCK LLP
601 Thirteenth Street, NW
Suite 1200 South
Washington, DC 20005
(202) 639-6000

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................. ii

BACKGROUND .................................................................................................................... 1

ARGUMENT ......................................................................................................................... 6

I.    The Complaint Must Be Dismissed Because this Court Lacks Personal
      Jurisdiction Over Warner Music Group. ............................................................... 6

      A.    Crichlow's Jurisdictional Allegations are Fatally Deficient. ................. 7

      B.    Warner Music Group is not "Doing Business" in the District. ............. 8

II.   The Forum Selection Clause Contained in the Artemis Agreement Requires
      Dismissal. ............................................................................................................. 11

      A.    The Artemis Agreement's Forum Selection Clause Is Fully Applicable to
            the Alleged Causes of Action. ............................................................... 12

      B.    The Artemis Agreement's Forum Selection Clause is Valid and Must Be
            Enforced. ................................................................................................ 13

III.  Dismissal of the Complaint Is Required by the Doctrine of Forum Non
      Conveniens. ......................................................................................................... 15

CONCLUSION ................................................................................................................... 18

# TABLE OF AUTHORITIES[*]

## CASES

* *AGS International Services S.A. v. Newmont USA Ltd.*, 346 F. Supp. 2d 64 (D.D.C. 2004) ..................................................................................................................................11

*America Federal of Government Employees, Local 2924 v. Federal Labor Relations Authority*, 470 F.3d 375 (D.C. Cir. 2006) ......................................................... 13-14

*American Patriot Insurance Agency, Inc. v. Mutual Risk Management, Ltd.*, 364 F.3d 884 (7th Cir. 2004).................................................................................................13

*Apotex Corp. v. Istituto Biologico Chemioterapico S.p.a.*, No. 02 C 5345, 2003 WL 21780965 (D. Ill. July 30, 2003)....................................................................17

*Artis v. Greenspan*, 223 F. Supp. 2d 149 (D.D.C. 2002)..................................................1

*Atlantic Tele-Network, Inc. v. Inter-American Development Bank*, 251 F. Supp. 2d 126 (D.D.C. 2003) .......................................................................................13, 17

*Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34 (D.D.C. 2003) ...........................6

*Baltierra v. West Va Board of Medicine*, 253 F. Supp. 2d 9 (D.D.C. 2003) ............................7, 10

*Bayles v. K-Mart Corp.*, 636 F. Supp. 852 (D.D.C. 1986) ...............................................9

*Bense v. Interstate Battery System of America, Inc.*, 683 F.2d 718 (2d Cir. 1982) ......................13

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985)....................................................8

* *Commerce Consultants International, Inc. v. Vetrerie Riunite S.p.A.*, 867 F.2d 697 (D.C. Cir. 1989) ....................................................................................... 11-12, 14

*Doe I v. State of Israel*, 400 F. Supp. 2d 86 (D.D.C. 2005)...............................................8

*EBM Group Corp., Ltd. v. Gulfstream Aerospace Corp.*, 145 F.R.D. 8 (D.D.C. 1992).................7

*El-Fadl v. Central Bank of Jordan*, 75 F.3d 668 (D.C. Cir. 1996)...................................8

*Environmental Research International, Inc., v. Lockwood Greene Engineers, Inc.*, 355 A.2d 808 (D.C. 1976) .............................................................................10

---

[*] Authorities upon we chiefly rely are marked with an asterisk.

\* *Fandel v. Arabian America Oil Co.*, 345 F.2d 87 (D.C. Cir. 1965) ..........................................10

*Fasolyak v. Cradle Society, Inc.*, No. Civ. A. 06-1126, 2007 WL 2071644 (D.D.C. July 19, 2007) ..........................................................................................................................9

*Furbee v. Vantage Press, Inc.*, 464 F.2d 835 (D.C. Cir. 1972) ....................................................14

*Gamma Construction Co. v. Werhan Folkers & Monihan, Inc.*, 11 F. App'x 814 (9th Cir. 2001) ..............................................................................................................................12

*GTE New Media Services Inc. v. BellSouth Corp.*, 199 F.3d 1343 (D.C. Cir. 2000) ....................6

*Gonzalez v. Internacional De Elevadores, S.A.*, 891 A.2d 227 (D.C. 2006) ..................................8

*Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506 (D.C. Cir. 2002) .......................................6, 8

*Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947) ...........................................................................15

*Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984) ....................................8

*International Shoe Co. v. Washington*, 326 U.S. 310 (1945) ..........................................................8

*Irwin v. World Wildlife Fund, Inc.*, 448 F. Supp. 2d 29 (D.D.C. 2006) ......................................15

*Jacobsen v. Oliver*, 201 F. Supp. 2d 93 (D.D.C. 2002) ..................................................................1

*L&L Construction Associates, Inc. v. Slattery Skanska, Inc.*, No. Civ. 05-1289, 2006 WL 1102814 (D.D.C. Mar. 31, 2006)................................................................................12

*Land v. Dollar*, 330 U.S. 731 (1947) ..............................................................................................1

\* *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972) ....................................................14, 15

*Mwani v. bin Laden*, 417 F.3d 1 (D.C. Cir. 2005) ..........................................................................6

*Naartex Consulting Corp. v. Watt*, 722 F.2d 779 (D.C. Cir. 1983) ................................................8

*Otor, S.A. v. Credit Lyonnais, S.A.*, No. 04 Civ. 6978, 2006 WL 2613775 (S.D.N.Y. Sept. 11, 2006) ...........................................................................................................................17

\* *Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981).................................................. 15, 16, 17-18

*Richard v. Bell Atlantic Corp.*, 946 F. Supp. 54 (D.D.C. 1996).................................................7, 8

*Silva v. Encyclopedia Britannica Inc.*, 239 F.3d 385 (1st Cir. 2001) ..........................................12

*Stewart Organization Inc. v. Ricoh Corp.*, 487 U.S. 22 (1988)..................................................14

*United States v. Ferrara*, 54 F.3d 825 (D.C. Cir. 1995).............................................................11

*Vanover v. Hantman*, 77 F. Supp. 2d 91 (D.D.C. 1999), *aff'd*, 38 F. App'x 4 (D.C. Cir.
    2000) ......................................................................................................................................1

*Worldwide Network Services, LLC v. DynCorp Intern.*, 496 F. Supp. 2d 59 (D.D.C.
    2007) ...........................................................................................................................12, 13

## STATUTES

D.C. Code § 13-334(a)......................................................................................................7, 8

Civil Procedure Rules (1998) U.K. S.I. 1998/3132 Pt. 34(I) r34.2 ..............................................17

Fed. R. Civ. P. 12(b)(2)..................................................................................................1, 7

Fed. R. Civ. P. 12(b)(3) ........................................................................................................1

Fed. R. Civ. P. 12(b)(6)........................................................................................................12

**STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION BY DEFENDANT WARNER MUSIC GROUP CORP. TO DISMISS THE COMPLAINT**

Defendant Warner Music Group Corp. ("Warner Music Group"), by its attorneys and pursuant to Federal Rule of Civil Procedure 12(b)(2), Federal Rule of Civil Procedure 12(b)(3), and the doctrine of forum non conveniens, submits this memorandum of law in support of its motion to dismiss the Complaint (i) for lack of personal jurisdiction, (ii) for improper venue due to a contractual forum selection clause mandating litigation of this dispute in the High Court of London and (iii) because Washington, D.C. is an inconvenient and inappropriate forum in that it has no connection to the underlying dispute and is not home to any of the relevant witnesses or documents.  In support thereof, Warner Music Group states as follows:

## BACKGROUND

*The Contracts Underlying this Dispute.*

On October 1, 1994, Plaintiff Herbert St. Claire Crichlow ("Crichlow"), a songwriter and resident of Sweden, and a company named Megasong Publishing A/S ("Megasong"), a Danish company, entered into a music publishing agreement (the "Megasong Agreement"), pursuant to which Crichlow granted Megasong the exclusive rights to certain of Crichlow's musical works. *See* Declaration of Jane Dyball ("Dyball Decl."), Ex. A (Megasong Agreement) ¶¶ 1, 2, 3, 7; Declaration of Paul M. Robinson ("Robinson Decl.") ¶ 11.[1]  The Megasong Agreement expressly provides that all disputes concerning that agreement will be litigated exclusively in Copenhagen,

---

[1]    On a motion to dismiss for lack of personal jurisdiction or venue, a court may consider material outside of the pleadings.  *Land v. Dollar*, 330 U.S. 731, 735 n.4 (1947); *Artis v. Greenspan*, 223 F. Supp. 2d 149, 152 (D.D.C. 2002) ("A court may consider material outside of the pleadings in ruling on a motion to dismiss for lack of venue, personal jurisdiction or subject matter jurisdiction").  The Court also may properly consider on a motion to dismiss the contracts referred to in the Complaint, and central to a plaintiff's claim, even if not affirmatively attached to the Complaint.  *Jacobsen v. Oliver*, 201 F. Supp. 2d 93, 110 (D.D.C. 2002); *Vanover v. Hantman*, 77 F. Supp. 2d 91, 98 (D.D.C. 1999), *aff'd*, 38 F. App'x 4 (D.C. Cir. 2000).

Denmark. Dyball. Decl. (Ex. A) (Megasong Agreement) ¶ 18.  In February 2002, Megasong was acquired by Warner/Chappell Music Denmark A/S, a music publishing company organized under the laws of Denmark.  *See* Robinson Decl. ¶ 11.  In July 2002, in London, England, Muziekuitgeverij Artemis BV, a Dutch music publishing company and a subsidiary of Warner/Chappell Music Group (Netherlands) BV, *id.* ¶ 7, entered into a music publishing agreement (the "Artemis Agreement") with a company named A Lemon Groove AB ("Lemon Groove AB"), Dyball Decl., Ex. B (Artemis Agreement) at 1.  Plaintiff Crichlow signed the Artemis Agreement on behalf of, and appears to own, Lemon Groove AB.  *See* Dyball Decl., Ex. B (Megasong Agreement) at 22.[2]  The Artemis Agreement obligates Muziekuitgeverij Artemis BV to pay certain royalties to Lemon Groove AB, *id.* at 21 ¶ 16(a)(ii)(c), including an advance of over 13 million Swedish kronor, *id.* at 19 ¶ 16(a)(i).  The Artemis Agreement also expressly provides that all disputes be litigated exclusively in the High Court of London.  *Id.* at 17 ¶ 9.

    *Crichlow's Allegations.*

    In his Complaint, Crichlow alleges that he is owed five hundred million dollars in royalties – referred to by Crichlow as his "detained income" – under the Megasong Agreement. Compl. ¶ 9.  Crichlow further alleges that during the negotiations of the Artemis Agreement an individual named Hans Desmond, a former employee of Warner/Chappell Music Scandinavia AB, represented to Crichlow that Warner/Chappell "would recover 'Crichlow's detained income' for the exclusive benefit of Crichlow."  *Id.* ¶ 12.  Crichlow further claims that "Desmond has not delivered Crichlow's detained income" from the Megasong Agreement, and that Desmond's alleged misrepresentation was made "to fraudulently induce Crichlow to sign

---

[2]  Crichlow, individually, is not a party to the Artemis Agreement put at issue by the Complaint. *Id.*, Ex. B (Artemis Agreement).  To the extent there is a claim at all, it would appear to be a claim belonging to Lemon Groove AB, and ***not*** Crichlow.  Crichlow, thus, is not a proper plaintiff in this case.

over the rights to his cash oozing catalogue" as part of the Artemis Agreement.  *Id.* ¶¶ 14, 15.

Based on these allegations, Crichlow alleges two counts – conversion and fraudulent

misrepresentation – and seeks damages and fees of over three billion dollars.

> *Warner Music Group's Lack of Involvement with the Contracts or Events.*

Warner Music Group, the putative defendant, is the ultimate parent (several corporate

levels removed) of Muziekuitgeverij Artemis BV, Megasong and Warner/Chappell Music

Scandinavia AB.  *See* Robinson Decl. ¶¶ 7-15.  But, other than that, Warner Music Group has no

connection whatsoever with the contracts or events involved in this dispute, and indeed did not

even exist at the time such contracts were entered into or such events took place.  *Id.* ¶ 5.  The

Complaint unsurprisingly is bereft of any allegations even suggesting that Warner Music Group

was involved in the events of which Crichlow complains.

Warner Music Group did not negotiate or sign the contracts.  Robinson Decl. ¶ 16;

Dyball Decl., Exs. A & B (Artemis Agreement and Megasong Agreement).  Warner Music

Group has not performed, and has no obligation to perform, under the contracts, *i.e.*, to exploit or

market the works in question.  Robinson Decl. ¶ 16; Dyball Decl., Exs. A & B (Artemis

Agreement and Megasong Agreement). Warner Music Group has not paid, and has no obligation

to pay, any royalties under the contracts.  Robinson Decl. ¶ 17; Dyball Decl., Exs. A & B

(Artemis Agreement and Megasong Agreement).  And Warner Music Group has not rendered,

and has no obligation to render, any accounting under the contracts.  Robinson Decl. ¶ 18;

Dyball Decl., Exs. A & B (Artemis Agreement and Megasong Agreement).

Warner Music Group is a publicly traded U.S. company, incorporated in Delaware and

with its principal place of business in New York.  Robinson Decl. ¶ 2.  It has many direct or

indirect subsidiaries and affiliates around the world that are engaged in various aspects of the

music business.  *Id.* ¶ 6.  As a matter of corporate structure, Warner Music Group is many times removed from the contracting companies – and from any companies even arguably involved in the facts and circumstances giving rise to this dispute.  The Artemis Agreement is between Lemon Groove AB and Muziekuitgeverij Artemis BV.  Dyball Decl., Ex. B (Artemis Agreement).  Muziekuitgeverij Artemis BV is owned directly not by Warner Music Group but rather by Warner/Chappell Music Group (Netherlands) BV.  Robinson Decl. ¶ 7.  Defendant Warner Music Group is *six* corporate levels removed from Muziekuitgeverij Artemis BV.[3]  The Megasong Agreement is between Crichlow and Megasong.  *Id.*, Ex. A (Megasong Agreement).  Defendant Warner Music Group is *seven* corporate levels removed from Megasong.[4]

> *Warner Music Group's Lack of Contact with the District of Columbia.*

Warner Music Group does not conduct business in the District of Columbia, nor is it authorized to do so.  Robinson Decl. ¶ 3.  Warner Music Group's sole operation in the District consists of a Vice-President of Public Policy and Government Relations and her assistant working out of office space that is rented, not owned, by Warner Music Group.  *See id.* ¶ 20.  These employees do not acquire, produce, advertise, sell or license Warner Music Group's sound recordings and musical compositions in the District, and they do not solicit or contract for business here on behalf of Warner Music Group.  *Id.* ¶ 21.  Nor do these employees have control

---

[3]  Muziekuitgeverij Artemis BV's parent, Warner/Chappell Music Group (Netherlands) BV is roughly 81% owned by New Chappell Inc.; which, in turn, is owned by Warner Bros. Music International Inc.; which ultimately is owned indirectly, via two non-operating holding companies, by Warner Music Group Corp.  Robinson Decl. ¶¶ 8-10.

[4]  Megasong is owned by Warner/Chappell Music Denmark A/S, an operating company in the music publishing business organized under the laws of Denmark.  Robinson Decl. ¶ 11.  Warner/Chappell Music Denmark A/S is owned by Warner/Chappell Music Scandinavia AB, an operating company in the music publishing business organized under the laws of Sweden; which, in turn, is owned by Warner Bros. Music International Inc.; which, in turn, is owned by Warner/Chappell Music, Inc.; which ultimately is owned indirectly, via two non-operating holding companies, by Warner Music Group Corp.  *Id.* ¶¶ 12-15.

or authority over employees elsewhere who are involved in Warner Music Group's business.  *Id.*
These employees have no knowledge of or involvement with any of the facts alleged in the
Complaint – none of which took place in the District of Columbia – and there are no documents
or other evidence relevant to this case located in Warner Music Group's public policy and
government relations office.  *Id.* ¶ 22.

     *The Location of the Events, Witnesses and Evidence.*

     All of the events relevant to this dispute took place and all of the witnesses and evidence
of any moment are located outside of the United States – specifically, London and Sweden.

     In negotiating the Artemis Agreement, Lemon Groove AB and Crichlow were
represented by attorneys in London: Mishcon de Reya Solicitors of Summit House, 12 Red Lion
Square, London.  *See* Dyball Decl., Ex. B (Artemis Agreement) at 1.  Muziekuitgeverij Artemis
BV similarly was represented by attorneys and others in London.  *Id.*  The other attorneys
involved were in Sweden.  Dyball Decl. ¶ 4.

     Crichlow is a resident of Sweden.  Compl. ¶ 3.  Hans Desmond, the individual accused
of making false representations, was located in Sweden at the time of the Artemis Agreement
negotiations, and he remains in Sweden today.  Dyball Decl. ¶ 5.  The advances under the
Artemis Agreement were paid in Swedish kronor.  *Id.* ¶ 6.  Royalty statements and payments for
the Artemis Agreement are based in Euros.  *Id.*  These royalties are generated by
Warner/Chappell Music Ltd., organized under the laws of England, in the name of
Muziekuitgeverij Artemis BV.  *Id.*[5]  The Megasong Agreement that preceded the Artemis
Agreement is between Crichlow and a Danish company – Megasong.  Robinson Decl. ¶ 11.  The

---

[5]    Warner/Chappell Music, Inc., headquartered in Los Angeles, approved the terms of the
Artemis Agreement but did not participate in the contract negotiations or performance.  *Id.* ¶ 7.

royalty accountings for earnings for the Megasong Agreement are based in Euros and Danish kronor.  Dyball Decl. ¶ 6.

In short, there is no meaningful connection between this dispute and the United States – let alone the District of Columbia.  It is no surprise that the underlying contracts at issue expressly provide for exclusive jurisdiction in England or Denmark.

## ARGUMENT

I.    **The Complaint Must Be Dismissed Because this Court Lacks Personal Jurisdiction Over Warner Music Group.**

In a diversity case, the district court's personal jurisdiction over a nonresident defendant is governed by state law, the application of which in turn is subject to the constraints of due process.    *Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 509 (D.C. Cir. 2002).  Accordingly, the court may not exercise personal jurisdiction over a defendant residing outside the District of Columbia unless the plaintiff demonstrates that a D.C. statute authorizes jurisdiction and that "a constitutionally sufficient relationship between the defendant and the forum" exists.  *Mwani v. bin Laden*, 417 F.3d 1, 8 (D.C. Cir. 2005) (quoting *Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987)) (internal quotation marks and alterations omitted).

The plaintiff bears the burden of establishing the court's jurisdiction over a defendant. *E.g., Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34, 42 (D.D.C. 2003).  This burden can be met only by alleging "specific facts on which personal jurisdiction can be based; [a plaintiff] cannot rely on conclusory allegations."  *Id.*; *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1349 (D.C. Cir. 2000) ("conclusory statements and intimations" are "not enough"). Crichlow does not and cannot allege facts that establish personal jurisdiction over Warner Music

Group in this action in the District of Columbia, and this action must therefore be dismissed. Fed. R. Civ. P. 12(b)(2).

### A.    Crichlow's Jurisdictional Allegations are Fatally Deficient.

Crichlow's Complaint asserts personal jurisdiction over Warner Music Group based on the single conclusory allegation that Warner Music Group supposedly "conducts business in the District of Columbia" and is therefore subject to the *general* jurisdiction of District of Columbia courts under D.C. Code § 13-334(a).  Compl. ¶¶ 2-3.  Crichlow did not (and could not) allege *specific* jurisdiction over Warner Music Group, because there is no connection at all between the facts at issue in this suit and the District of Columbia.  But, as a claimed basis for general jurisdiction, the Complaint does nothing more than parrot the statutory language, which provides for jurisdiction over corporations "doing business" in the District.  D.C. Code § 13-334(a). Crichlow pleads no facts that would permit this Court to conclude that Warner Music Group conducts business here.

Crichlow's failure to allege specific facts in support of personal jurisdiction over Warner Music Group requires dismissal of the Complaint.  *E.g., Baltierra v. West Va Bd. of Medicine*, 253 F. Supp. 2d 9, 14 (D.D.C. 2003) (no personal jurisdiction where plaintiff made only "vague and unsupported" jurisdictional allegations); *Richard v. Bell Atlantic Corp.*, 946 F. Supp. 54, 72 (D.D.C. 1996) (rejecting plaintiff's "bald assertion" as support for a finding of personal jurisdiction); *EBM Group Corp., Ltd. v. Gulfstream Aerospace Corp.*, 145 F.R.D. 8, 10 (D.D.C. 1992) (mere assertion that defendant was "engaged in the continuous and systematic transaction and doing of business in Washington, D.C.," was not an allegation of "specific facts that could establish the requisite contacts with the District").

Nor does Crichlow's Complaint contain any facts from which the Court could determine that the exercise of jurisdiction over Warner Music Group would comport with due process.  The

Complaint falls far short of the requirement that a plaintiff make a "prima facie showing necessary to carry the burden of establishing personal jurisdiction." *Naartex Consulting Corp. v. Watt*, 722 F.2d 779, 787 (D.C. Cir. 1983); *id.* at 788 (denial of jurisdictional discovery appropriate where plaintiff made "no allegations of specific facts that could establish the requisite contacts with the District"); *Richard*, 946 F. Supp. at 71 (no jurisdiction where plaintiff's "allegations do not make out a prima facie showing of jurisdiction over [defendant], because they are conclusory"). Because Crichlow's jurisdictional allegations are "patently inadequate," the Complaint must be dismissed. *Doe I v. State of Israel*, 400 F. Supp. 2d 86, 122 (D.D.C. 2005) (dismissing complaint).

### B.    Warner Music Group is not "Doing Business" in the District.

Had Crichlow diligently investigated Warner Music Group's contacts with the District, he would have known that he could not plead facts sufficient to assert general jurisdiction. Under D.C. Code § 13-334(a), in order to establish general jurisdiction over a foreign corporation allegedly "doing business" in the District, a plaintiff must demonstrate "a continuing corporate presence in the forum directed at advancing the corporation's objectives." *El-Fadl v. Central Bank of Jordan*, 75 F.3d 668, 675 (D.C. Cir. 1996) (internal quotation marks and ellipse omitted); *see also Gorman*, 293 F.3d at 510; *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415-17 (1984). Absent a showing of "continuous and systematic" contacts, the plaintiff cannot meet its burden to show that "the defendant corporation … purposely avail[ed] itself of the privilege of conducting activities within the forum state, and [that] its continuing contacts with the District of Columbia … provide[d] it with clear notice that it is subject to suit here." *Gonzalez v. Internacional De Elevadores, S.A.*, 891 A.2d 227, 233 (D.C. 2006); *see generally Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985). Crichlow could not begin to meet such a burden.

Warner Music Group is in the business of marketing, selling and licensing recorded music, and of exploiting and marketing music compositions.  Robinson Decl. ¶ 4.  As described above, Warner Music Group is the ultimate parent company of any number of U.S. and international companies that are in either the recorded music or the music publishing business.  *See supra* 3-4.  Warner Music Group's sole operation in the District, however, consists of a Vice-President of Public Policy and Government Relations and her assistant who occupy a small, rented office.  *See* Robinson Decl. ¶ 20.  Warner Music Group does not conduct business, and is not authorized to conduct business, in the District.  *Id.* ¶ 3.  The employees in the public policy and government relations office do not acquire, produce, advertise, sell or license Warner Music Group's sound recordings or musical compositions, and they do not solicit or contract for business here on behalf of Warner Music Group.  *Id.* ¶ 21.  Nor do these employees have control or authority over employees elsewhere who are involved in Warner Music Group's business.  *Id.* ¶ 22.  In short, Warner Music Group is not "doing business" in the District of Columbia.  *See, e.g.*, *Bayles v. K-Mart Corp.*, 636 F. Supp. 852, 856 (D.D.C. 1986) (no jurisdiction under § 13-334(a) where no evidence that defendant had agents in the District who "solicit sales or negotiate contracts on defendant's behalf").

It is well settled that the maintenance of a D.C. presence in order to liaise with government officials – precisely the nature of Warner Music Group's only activities in D.C. – does ***not*** subject a corporation to the general jurisdiction of courts in the District of Columbia.  "[C]ontrolling precedent recogniz[es] that general jurisdiction is inappropriate when a defendant's presence in this particular forum is necessitated by virtue of the fact that this is the only place where federal agencies, embassies, and other such instrumentalities are located."  *Fasolyak v. Cradle Society, Inc.*, No. Civ. 06-1226, 2007 WL 2071644, at *9 (D.D.C. July 19,

2007) (citing *Fandel v. Arabian Am. Oil Co.*, 345 F.2d 87, 88-89 (D.C. Cir. 1965)); *see Baltierra*, 253 F. Supp. 2d at 13 (collecting cases). This "government contacts" exception has an important public purpose: "To permit our local courts to assert personal jurisdiction over nonresidents whose sole contact with the District consists of dealing with a federal instrumentality not only would pose a threat to free public participation in government, but also would threaten to convert the District of Columbia into a national judicial forum." *Envtl. Research Int'l, Inc., v. Lockwood Greene Eng'rs, Inc.*, 355 A.2d 808, 813 (D.C. 1976).

Courts have frequently applied this principle to bar the assertion of general jurisdiction over defendants like Warner Music Group whose only connection to the District consists of government contacts. For example, in *Fandel v. Arabian American Oil Co.*, the defendant oil company maintained "a six-room office in a downtown Washington office building, occupied by five people, two of whom are secretarial employees." 345 F.2d 87, 88 (D.C. Cir. 1965). Like Warner Music Group, the corporation in *Fandel* did not solicit business or make contracts in D.C. from this address. *Id.* Rather, the corporation maintained its D.C. office for the purpose of facilitating relations with the State Department, other branches of the U.S. government, and various private and public organizations interested in the Middle East. *Id.* As the court concluded in affirming dismissal of the case, the lobbying purpose of the D.C. office was fundamentally "different in kind" from the corporate defendant's ordinary business of producing and selling oil. *Id.* at 89.

> Washington presents many business organizations with special needs for a continuous and ponderable physical presence there, which needs are not those customarily associated with strictly commercial operations; and . . . the purpose of Congress was not to make that presence in every case a base for the assertion of personal jurisdiction.

*Id.*

Similarly, in *AGS International Services S.A. v. Newmont USA Ltd.*, 346 F. Supp. 2d 64 (D.D.C. 2004), this court held that D.C. Code § 13-334(a) did not confer general jurisdiction over Newmont USA, a mining company incorporated in Delaware with its principal place of business in Colorado. The company rented a two-room office in D.C. staffed with an employee whose duties were to "act as a liaison between Newmont USA and the federal government, and on occasion foreign embassies, not to sale or marketing of Newmont USA products." *Id.* at 75. The court concluded that D.C. Code § 13-334(a) did not confer jurisdiction over the company because the company maintained its D.C. office "to interact with entities of the United States, along with public and private educational and international organizations"; these activities "do not amount to the kind of presence intended to fall within the scope of D.C. Code § 13-334(a)." *Id.*; *see also United States v. Ferrara*, 54 F.3d 825, 831 (D.C. Cir. 1995) ("contact with a federal instrumentality located in the District will not give rise to personal jurisdiction").

Warner Music Group's federal government liaison office in the District is indistinguishable from the corporate defendants' lobbying offices in cases such as *Fandel* and *Newmont*. The purpose of Warner Music Group's D.C. office is different in kind from its ordinary business as a music company. Warner Music Group is not "doing business" in the District for the purposes of the general jurisdiction statute. Crichlow has asserted no other statutory basis for personal jurisdiction over Warner Music Group, and indeed no other possible basis exists. The Complaint, therefore, must be dismissed for lack of personal jurisdiction.

## II.  The Forum Selection Clause Contained in the Artemis Agreement Requires Dismissal.

The Court must also dismiss this Complaint for improper venue under Rule 12(b)(3) because the forum selection clause in the Artemis Agreement that forms the crux of Crichlow's Complaint requires Crichlow to litigate his dispute in the High Court of London. *Commerce*

*Consultants Int'l, Inc. v. Vetrerie Riunite S.p.A.*, 867 F.2d 697, 699 (D.C. Cir. 1989) (dismissing

under Rule 12(b)(3) based on forum selection clause); *Gamma Constr. Co. v. Werhan Folkers &*

*Monihan, Inc.*, 11 F. App'x 814 (9th Cir. 2001) (same).  Specifically, this contract provides that

it "shall be governed by and interpreted in accordance with the laws of England and Wales.  The

High Court in London *shall have exclusive jurisdiction*."  Dyball Decl., Ex. B (Artemis

Agreement) at 17 ¶ 9 (emphasis added).[6]

### A. The Artemis Agreement's Forum Selection Clause Is Fully Applicable to the Alleged Causes of Action.

Crichlow alleges that during the Artemis Agreement negotiations Hans Desmond, a

former employee of Warner/Chappell Music Scandinavia AB, falsely represented that

Warner/Chappell would deliver certain "detained income" allegedly owed under the Megasong

Agreement in order "to fraudulently induce Crichlow to sign over his rights to his cash oozing

catalogue."  Compl. ¶¶ 12-15.  The contract that Crichlow alleges was the result of fraudulent

inducement is the Artemis Agreement between Muziekuitgeverij Artemis BV and Lemon

Groove AB.  *See* Dyball Decl., Ex. B (Artemis Agreement) at 1.

The Artemis Agreement thus lies at the core of Crichlow's case.  It is the contract he

alleges Lemon Groove AB was fraudulently induced to enter, and it is the source of the alleged

"duty to deliver" Crichlow's "detained income."  Compl. ¶¶ 15, 18, 26.  The contractual forum

selection clause is therefore clearly applicable to Crichlow's claims.  *Worldwide Network Servs.,*

---

[6] Although the substantive analysis does not change, some courts have held that Rule 12(b)(6) or the doctrine of forum non conveniens is an appropriate mechanism for a forum selection clause dismissal.  *E.g., Silva v. Encyclopedia Britannica Inc.*, 239 F.3d 385, 387-88 (1st Cir. 2001) (treating motion to dismiss based on a forum selection clause as a Rule 12(b)(6) motion); *L&L Constr. Associates, Inc. v. Slattery Skanska, Inc.*, No. Civ. 05-1289, 2006 WL 1102814, at *4 (D.D.C. Mar. 31, 2006) (forum non conveniens).  Warner Music Group is entitled in the alternative to dismissal based on the forum selection clause under Rule 12(b)(6) or as a matter of forum non conveniens.

*LLC v. DynCorp Intl.*, 496 F. Supp. 2d 59, 63 (D.D.C. 2007) ("strategic or artfully drawn pleadings will not be permitted to circumvent an otherwise applicable forum selection clause"); *Bense v. Interstate Battery System of America, Inc.*, 683 F.2d 718, 721-22 (2d Cir. 1982) (applying forum selection clause in distributorship agreement to anti-trust claim that concerned the agreement). If a plaintiff's claims "involve the same operative facts" or "turn on the existence and performance of the contract," the claims fall within the scope of the contract's forum selection clause. *Worldwide Network Servs.,* 496 F. Supp. 2d at 63. It is of no moment that Crichlow pleaded his claims as fraudulent inducement and conversion claims. *Am. Patriot Ins. Agency, Inc. v. Mutual Risk Mgmt., Ltd.*, 364 F.3d 884, 889 (7th Cir. 2004) ("a dispute over a contract does not cease to be such merely because instead of charging breach of contract the plaintiff charges a fraudulent breach, or fraudulent inducement, or fraudulent performance . . . ."); *Worldwide Network Servs.,* 496 F. Supp. 2d at 63 ("[N]arrowly interpreting a forum selection clause may permit parties to avoid it by 'simply pleading non-contractual claims'; an outcome that 'runs counter to the law favoring forum selection clauses.'").

**B.    The Artemis Agreement's Forum Selection Clause is Valid and Must Be Enforced.**

There can be no question that the Artemis Agreement's forum selection clause, which states that the London High Court "shall have exclusive jurisdiction[,]" constitutes a mandatory forum selection clause. Dyball Decl., Ex. B (Artemis Agreement) at 16 (emphasis added). *See Atlantic Tele-Network, Inc. v. Inter-American Development Bank*, 251 F. Supp. 126, 134-36 (D.D.C. 2003) (holding that a clause providing that parties "shall submit themselves to the jurisdiction" of a particular court constituted mandatory forum selection clause that required dismissal of suit). "Interpretation of a contract, like statutory and treaty interpretation, must begin with the plain meaning of the language." *Am. Fed. of Gov't Employees, Local 2924 v.*

13

*Fed. Labor Relations Auth.*, 470 F.3d 375, 381 (D.C. Cir. 2006). The unmistakable meaning of the phrase "shall have exclusive jurisdiction" is that no court other than the London High Court may hear disputes relating to the contract.

The federal courts furthermore have a strong and consistent policy in favor of enforcing forum selection clauses. As the Supreme Court has explained, where "[t]he choice of that forum was made in an arm's-length negotiation by experienced and sophisticated businessmen, . . . absent some compelling and countervailing reason it should be honored by the parties and enforced by the courts." *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 12 (1972); *Commerce Consultants*, 867 F.2d at 700 (noting the "strong presumption in favor of enforcement of freely negotiated contractual choice-of-forum provisions" (quotation marks omitted)); *see also Stewart Org. Inc. v. Ricoh Corp.*, 487 U.S. 22, 33 (1988) (Kennedy, J., concurring) ("a valid forum-selection clause [should be] given controlling weight in all but the most exceptional case").

The burden thus rests squarely upon Crichlow to demonstrate that pursuing this suit in London would be "so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court." *Bremen*, 407 U.S. at 18. This is a burden Crichlow cannot meet. *See Commerce Consultants*, 867 F.2d at 699 (affirming dismissal of suit based on mandatory forum selection clause); *Furbee v. Vantage Press, Inc.*, 464 F.2d 835, 836 (D.C. Cir. 1972) (same). Litigating this dispute in London patently would not deny Crichlow a remedy or his day in court. To the contrary, as discussed below, it would result in the dispute being litigated in a far more convenient and logical forum.[7]

---

[7] There is only one other forum in which Crichlow's complaint arguably could be litigated: Denmark. This is the venue required by the Megasong Agreement, which is the contract that Crichlow claims resulted in him being owed $500 million in "detained income." Compl. ¶ 9.

**III.    Dismissal of the Complaint Is Required by the Doctrine of Forum Non Conveniens.**

Because of the express contractual forum selection clause, the Court should not need to reach the question of whether this suit should be dismissed on forum non conveniens grounds. *See Bremen*, 407 U.S. at 15 (holding that a forum-selection clause should control and where such a clause is present a defendant need not justify dismissal on forum non conveniens grounds). That said, there can be no dispute that, independently, dismissal is warranted as a matter of forum non conveniens.

Under the doctrine of forum non conveniens, a suit should be dismissed where there is an adequate alternative forum, and the balance of private and public interest factors favors dismissal. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 (1981). Here, dismissal is warranted because there is clearly an adequate alternative foreign forum – England – and all relevant public and private interest factors overwhelmingly weigh in favor of litigating the dispute in that forum. *See Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 507 (1947); *El-Fadl*, 75 F.3d at 677.

Moreover, because Crichlow resides in Sweden and therefore is "a stranger to [this] forum," the Court should not defer to Crichlow's choice of forum. *Irwin v. World Wildlife Fund, Inc.*, 448 F. Supp. 2d 29, 33 (D.D.C. 2006) (quotation marks omitted) (dismissing complaint on forum non conveniens grounds and declining to defer to plaintiff's choice of the District of Columbia as a forum where the plaintiff was a foreign citizen and had been residing in Gabon, even though the plaintiff was presently residing in the District). "[T]he central purpose of any

---

Specifically, the Megasong Agreement requires that "[i]n the event of a controversy arising out of the interpretation of the stipulations of this Agreement or in the event of a breach, the controversy shall be adjudicated by a Danish court, namely (*Sø- og Handelsretten, Bradgada 70, D-1261 Copenhagen K*." Dyball Decl., Ex. A (Megasong Agreement) ¶ 18. The broad scope of this clause clearly encompasses any dispute over nonpayment of royalties under the agreement. Assuming arguendo that the Megasong Agreement rather than the Artemis Agreement governs Plaintiff's claims, dismissal is required in order to enforce the Megasong Agreement's forum selection clause, which requires all disputes be litigated in Denmark.

forum non conveniens inquiry is to ensure that the trial is convenient, [and thus] a foreign plaintiff's choice deserves less deference." *Piper Aircraft*, 454 U.S. at 256.

Each of the private interest factors weigh in favor of England rather than the District of Columbia as the situs for this litigation. Relevant factors include: "the relative ease of access to sources of proof; the availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses" and any "other practical problems that [would] make trial of a case easy, expeditious, and inexpensive." *Id.* at 241 n.6. None of the events, evidence or parties involved in this dispute have any connection whatsoever to the District of Columbia or, indeed, the United States; their connection is instead to England and Sweden.

During the Artemis Agreement negotiations, both Lemon Groove AB and Crichlow on the one hand, and Muziekuitgeverij Artemis BV on the other, were represented by London attorneys. *Id.*, Ex. B (Artemis Agreement) at 1. The other attorneys involved were in Sweden. Dyball Decl. ¶ 4. Crichlow is in Sweden. Compl. ¶ 3. Since 2002, and in connection with this dispute, Crichlow has continued to be represented by a number of London attorneys. Dyball Decl. ¶ 8.

Hans Desmond is located in Sweden presently and was in Sweden during the Artemis Agreement negotiations. Dyball Decl. ¶ 5. The Artemis Agreement advances were paid in Swedish kronor. *Id.* ¶ 6. The Artemis Agreement royalty statements and payments are based in Euros, and royalty accountings for earnings under the Megasong Agreement are in Euros and Danish kronor. *Id.* Warner/Chappell Music Ltd., an English company, generates the Artemis Agreement royalty statements on behalf of Muziekuitgeverij Artemis BV. *Id.*

Further, all of the companies even arguably involved in the negotiation or performance of either contract are foreign entities. Muziekuitgeverij Artemis BV is Dutch. Robinson Decl. ¶ 7.

Megasong is Danish, as is Warner/Chappell Music Denmark A/S, the company that acquired

Megasong in 2002. *Id.* ¶ 11. Warner/Chappell Music Scandinavia AB, the former employer of

Hans Desmond, is a Swedish company. *Id.* ¶ 12. Warner/Chappell Music Ltd. is an English

company. Dyball Decl. ¶ 6.

The witnesses and evidence thus are located primarily in England. To the extent they are

not in England, any witnesses and evidence of import are located in Sweden.[8] Absolutely no

witnesses or evidence are located in the District of Columbia.[9] Access to proof is far easier in

England than it is here. Compulsory process is available in England with respect to the

witnesses there, while literally not a single witness could be compelled to appear in the District.

*See* Civil Procedure Rules (1998) U.K. S.I. 1998/3132 Pt. 34(I) r34.2. The cost of obtaining the

attendance of willing witnesses necessarily is far less in England than it is here. In sum,

litigating this dispute in England would be far easier, more expeditious and less expensive than it

would be to litigate it here. *See Piper Aircraft*, 454 U.S. at 241 n.6.[10]

The public interest factors also support dismissal. Those factors include "administrative

difficulties flowing from court congestion; the local interest in having localized controversies

decided at home; the interest in having the trial of a diversity case in a forum that is at home with

the law that must govern . . .; the avoidance of unnecessary problems in conflict of laws, or in the

---

[8]  There may also be evidence in the Netherlands or Denmark by virtue of Muziekuitgeverij
Artemis BV being Dutch and Megasong being Danish.

[9]  The sole involvement of a U.S. entity was the approval of the terms of the Artemis Agreement
by Warner/Chappell Music, Inc. Dyball Decl. ¶ 7.

[10]  The fact that the contract requires litigation of such disputes in the High Court of London also
weighs in favor of dismissing this action on forum non conveniens grounds. *See Atlantic Tele-
Network*, 251 F. Supp. 2d at 136 (dismissing on forum non conveniens grounds in part because
forum selection clause specified foreign forum); *Otor, S.A. v. Credit Lyonnais, S.A.*, No. 04 Civ.
6978, 2006 WL 2613775, at *5 (S.D.N.Y. Sept. 11, 2006) (same); *Apotex Corp. v. Instituto
Biologico Chemioterapico S.p.a.*, No. 02C5345, 2003 WL 21780965, at *7 (D. Ill. July 30,
2003) (same).

application of foreign law, and the unfairness of burdening citizens in an unrelated forum with jury duty." *Id.* at 241 n.6 (internal quotation marks omitted). Here, there can be no local interest at all because the dispute has no connection whatsoever to the United States, let alone the District of Columbia. It would be manifestly unfair to this Court and the citizens of this jurisdiction to burden them with this litigation.

All relevant considerations dictate that this dispute be litigated in the forum that the parties-in-interest agreed would be the exclusive jurisdiction for disputes: London, England.

## CONCLUSION

For the foregoing reasons, Warner Music Group respectfully submits that the Complaint must be dismissed.


Dated:  September 20, 2007                     Respectfully submitted,


                                  By:    /s/ Steven B. Fabrizio
                                         Steven B. Fabrizio (DC Bar 436482)
                                         JENNER & BLOCK LLP
                                         601 Thirteenth Street, NW
                                         Suite 1200 South
                                         Washington, DC 20005
                                         (202) 639-6000

                                         *Attorney for Defendant Warner Music Group Corp.*

18

## CERTIFICATE OF SERVICE

I hereby certify that on September 20, 2007, I caused copies of the foregoing Motion by

Defendant Warner Music Group Corp. to Dismiss the Complaint, Statement of Points and

Authorities in Support of Motion Filed by Defendant Warner Music Group Corp. to Dismiss the

Complaint, Declaration of Paul M. Robinson, Declaration of Jane Dyball, and Proposed Order to

be served on the following counsel by first class mail, postage prepaid:

      Prof. Dr. Chernow M. Jalloh, Esq.
      The Jallow Law Firm
      1150 Connecticut Avenue N.W.
      Suite 900
      Washington, DC  20036-4197
      *Attorney for Plaintiff Herbert St. Clair Crichlow*

                        /s/ Steven B. Fabrizio_____
                        Steven B. Fabrizio

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| HERBERT ST. CLAIRE CRICHLOW, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 07-01622 (HHK) |
| v. | ) | |
| | ) | |
| WARNER MUSIC GROUP CORP., | ) | |
| | ) | |
| Defendant. | ) | |

### DECLARATION OF PAUL M. ROBINSON

I, Paul M. Robinson, hereby declare as follows:

1.      I am Executive Vice President and General Counsel of Warner Music Group Corp., formerly known as WMG Parent Corp. ("Warner Music Group"). From 1995 to 2004, I was a member of the corporate legal department of the Warner Music Group division of Time Warner Inc. ("Time Warner"). When this division was purchased by Warner Music Group in March 2004, I became part of the corporate legal department of Warner Music Group, and in January 2007 I began to act as General Counsel. I submit this declaration in support of Warner Music Group's motion to dismiss the Complaint filed in this action. I have personal knowledge of the matters discussed in this declaration and, if called upon, I could and would testify to each of the statements made herein.

2.      Warner Music Group is a publicly traded corporation, organized and in good standing under the laws of the State of Delaware, with its principal place of business located at its corporate headquarters in New York, New York.

3.    Warner Music Group does not conduct business, and is not authorized to conduct business, in Washington, D.C.

4.    Warner Music Group is in the business of marketing, selling and licensing recorded music and of exploiting and marketing music compositions.

5.    Warner Music Group was created in November 2003 as an acquisition vehicle by the sponsor group that purchased Time Warner's Warner Music Group division in March 2004.

6.    Warner Music Group has many direct or indirect subsidiaries and affiliates around the world that are engaged in various aspects of the music business.

7.    Muziekuitgeverij Artemis BV is a Dutch company and is owned by Warner/Chappell Music Group (Netherlands) BV.

8.    Warner/Chappell Music Group (Netherlands) BV is roughly 81% owned by New Chappell Inc.

9.    New Chappell Inc. is owned by Warner Bros. Music International Inc.

10.    Warner Bros. Music International Inc. is owned indirectly, via two non-operating holding companies, by Warner Music Group Corp.

11.    In February 2002, Megasong Publishing A/S ("Megasong"), a Danish company, was purchased by Warner/Chappell Music Denmark A/S, an operating company in the music publishing business organized under the laws of Denmark.

12.    Warner/Chappell Music Denmark A/S is owned by Warner/Chappell Music Scandinavia AB, an operating company in the music publishing business organized under the laws of Sweden.

13.    Warner/Chappell Music Scandinavia AB is owned by Warner Bros. Music International Inc.

14.    Warner Bros. Music International Inc. is owned by Warner/Chappell Music, Inc.

15.    Warner/Chappell Music, Inc., is owned indirectly, via two non-operating holding companies, by Warner Music Group Corp.

16.    Warner Music Group did not negotiate either the July 1, 2002 publishing agreement between Muziekuitgeverij Artemis BV and A Lemon Groove AB (the "Artemis Agreement") or the October 1, 1994 publishing agreement between Herbert St. Claire Crichlow and Megasong Publishing A/S (the "Megasong Agreement"), and Warner Music Group has not rendered performance under those contracts, *i.e.*, by exploiting and marketing certain works written by Plaintiff.

17.    Warner Music Group has not paid any royalties under the Artemis Agreement or the Megasong Agreement.

18.    Warner Music Group has not rendered any accounting under the Artemis Agreement or the Megasong Agreement.

19.    Warner Music Group's sole operation in the District consists of a small public policy and government relations office, located at 1025 F Street, N.W., Washington, D.C. 20005.

20.    Warner Music Group's public policy and government relations office is staffed by two employees: a Vice-President of Public Policy and Government Relations and her assistant. The office premises are rented not owned by Warner Music Group.

21.    The two employees at Warner Music Group's public policy and government relations office perform tasks related exclusively to lobbying and other government relations activities. These employees do not acquire, produce, advertise, sell or license Warner Music Group's sound recordings and musical compositions in the District. They do not solicit or

contract for business in the District on behalf of Warner Music Group.  They do not have control or authority over employees elsewhere who are involved in Warner Music Group's business.

22.     The two employees in Warner Music Group's public policy and government relations office have no knowledge of or involvement with any of the facts alleged in the Complaint, and there are no documents or other evidence relevant to this case located in the public policy and government relations office.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.  Executed at New York, New York, on this 19th day of September, 2007.

Paul M. Robinson

4

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

HERBERT ST. CLAIRE CRICHLOW,    )
)
       Plaintiff,    )
)
       v.    )    Civil Action No. 07-01622 (HHK)
)
WARNER MUSIC GROUP CORP.,    )
)
       Defendant.    )
)

## DECLARATION OF JANE DYBALL

I, Jane Dyball, hereby declare as follows:

1.    I am Senior Vice-President International Legal & Business Affairs of Warner/Chappell Music, the music publishing division of Warner Music Group Corp. ("Warner Music Group"). I have been employed in various roles in Warner/Chappell Music's Legal & Business Affairs department since 1992. I submit this declaration in support of Warner Music Group's motion to dismiss the Complaint filed in this action. I have personal knowledge of the matters discussed in this declaration and, if called upon, I could and would testify to each of the statements made herein.

2.    Attached hereto as Ex. A is a true and correct copy of the October 1, 1994, publishing agreement between Herbert St. Claire Crichlow and Megasong Publishing A/S (the "Megasong Agreement").

3.    Attached hereto as Ex. B is a true and correct copy of the July 1, 2002, publishing agreement between Muziekuitgeverij Artemis BV and A Lemon Groove AB (the "Artemis Agreement").

4.    The Artemis Agreement was negotiated by attorneys for Muziekuitgeverij Artemis BV, A Lemon Groove AB and Herbert St. Claire Crichlow located in England and Sweden.

5.    Hans Desmond was formerly employed by Warner/Chappell Music Scandinavia AB. During this employment, including at the time the Artemis Agreement was negotiated and executed, he was located in Sweden. He remains in Sweden today.

6.    The advances under the Artemis Agreement were paid in Swedish kronor. Royalty statements and payments for the Artemis Agreement are based in Euros, and are generated by Warner/Chappell Music Ltd., an English company, in the name of Muziekuitgeverij Artemis BV. The royalty accountings for earnings for the Megasong Agreement are based in Euros and Danish kronor.

7.    Warner/Chappell Music, Inc., headquartered in Los Angeles, approved the terms of the Artemis Agreement but did not participate in the negotiations or performance of that contract.

8.    Since 2002, Crichlow has been represented by a number of London attorneys in connection with this dispute.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed at London, England on this _20_ day of September, 2007.

Jane Dyball

2

**EXHIBIT A**

**To the Declaration of Jane Dyball**

**Executed at London, England on this 20 day of September 2007**

JANE DYBALL

22-07-04  10:50  From-WARNER/CHAPPELL LEGAL & BUS AFFAIRS

19-JAN-2000 20:48    ICR MANAGEMENT    +4684620618    6.12
23/09/99    09:10    MEGA ORDS - DENMARK + 0084607149397    NR.124    03

# PUBLISHING AGREEMENT

**Table of contents:**

1. The Parties
2. Territory
3. Scope of Agreement
4. Assignment of exclusivity
5. Sub-assignment to Third Party
6. Royalties - Mechanical License
7. Royalties - Dramatic License
8. Royalties - Print Rights, a.o.
9. Composer's Warranty
10. KODA / NCB
11. Publisher's Power of Attorney
12. Royalty Accounting
13. Copyright Protection
14. Term of Agreement
15. Copyright
16. Miscellaneous Provisions
17. Breach of Contract
18. Jurisdiction

COPY

By and between

Herbert Crichlow - a.k.a. Deep Fried
Skattungbyvägen 29
S-12080 Arsta, Sweden
Cpr.no. 381168-1319

hereinafter referred to as "The Composer", and

Megasong Publishing A/S
Linnésgade 14
DK-1361 Copenhagen K, Denmark

hereinafter referred to as "The Publisher",

on this day jointly and severally agree as set forth hereunder, as the originator according to the Danish Copyright Act has the power to assign to third party the right to handle and act for what concerns all his musical works:

## 1. The Parties

The Composer/originator is the a.m. individual Herbert Crichlow. This Agreement is binding for this individual.

The Publisher is Megasong Publishing A/S, Linnésgade 14, DK-1361 Copenhagen K., Denmark.

## 2. Territory

The rights granted by Composer to Publisher in accordance to present Agreement shall cover the

Territory of the world

## 3. Scope of Agreement

Whereas Composer holds rights to musical works and wishes to exploit said rights for commercial purposes, and whereas Publisher is in a position to exploit said rights commercially, the composer hereby assigns the full, exclusive and unencumbered transferrable copyright, inclusive of Grand Rights, to the compositions enclosed hereto on Schedule 2, which have been composed and/or authored and/or arranged by the Composer. In respect of these titles the rights are assigned to Publisher retroactive from the day of release.

Without any further, ulterior agreement therefor, the relevant titles being added to Schedule 2 for the sake of good order, this Agreement is also inclusive of any and all copyrights in and to all future titles created by Composer to himself as an artist or created to other artists, provided that such titles for other artists are released through* a Mega Records Company, a Chedron Records Company or a BMG Records Company. *or produced by Ø.

## 4. Assignment of exclusivity

The exclusivity of the Composer, which is herewith assigned to Publisher, consists of the right to act in two respects:

- The right for publisher to multiply and manu-facture copies of the works,
- The right to make the works public

The s.m. rights are inclusive of the right to make recordings by mechanical means, now known or invented futurely, such as phonograph records, audio tapes, video tapes, videodiscs, DAT's a.s.o., as well as the rights to the public performance of the subject titles in respect of concerts, films, radio, television, s.s.o.

The assignment results in the following rights for the Publisher:

- the exclusive right to make copies and dissemination to the public throughout the Territory ('the World),
- the exclusive right to sell or have sold the works,
- the right to be in receipt of publishing earnings,
- the exclusive right to negotiate with third party on behalf of Composer,
- the right to issue the mechanical licensing through NCB (Nordic Copyright Bureau),
- the right to report the works to the relevant copyright organisations,
- the exclusive right to translate the works to other languages than the original,
- the exclusive right to other adaptations of the works, which does not collide with the Droit Morale of

Composer.

## 5. Sub-assignment to Third Party

Publisher has the right to license the titles subject to present Agreement to Third Party within the Territory.

The Publisher is granted the right to assign the rights and obligations in respect of this Agreement, in part or in whole, to Third Party with or without a right for Third Party's sub-assignment. Publisher is furthermore hereby empowered to finalise agreements with a foreign Publisher for a specific Territory outside Publisher's own normal territory (i.e. Scandinavia).

## 6. Royalties - Mechanical License

a) Mechanical licenses - within the Nordic Territory:

| | |
|---|---|
| Composer (lyricist/arranger): | 66 2/3% |
| Publisher: | 33 1/3% |

of the Net Income.

b) Mechanical licenses - outside the Nordic Territory:

| | |
|---|---|
| Composer (lyricist/arranger): | 50% |
| Publisher: | 50% |

of the net income, i.e. after deduction of sub-publishers share.

In Scandinavia the settling of mechanical licenses is carried out and administered by the organisation NCB (Nordic Copyright Bureau).

## 7. Royalties - Dramatic License

a) Dramatic licenses - within the Nordic Territory:

| | |
|---|---|
| Composer (lyricist/arranger): | 66 2/3% |
| Publisher: | 33 1/3% |

of the Net Income.

b) Dramatic licenses - outside the Nordic Territory:

| | |
|---|---|
| Composer (lyricist/arranger): | 50% |
| Publisher: | 50% |

of the Net Income, i.e. after deduction of sub-publishers share.

In Denmark the settling of dramatic licenses is carried out and administered by the organisation KODA.

## 8. Royalties - Print Rights

For each copy printed and sold in the Nordic Territory

22-07-04 10:51 From-WARNER/CHAPPELL LEGAL & BUS AFFAIRS T-339 P.08/22 F-079

23/09/99 09:10 MEGA RDS ~ DENMARK + 0004687149397 NR.124 P.05

Publisher shall pay Composer a royalty equal to **2/3rds** of the Net Income acc...

In the event that subject titles are compiled with other titles, the royalty will be calculated on a pro rata numeris basis.

In the event of foreign sales outside of the Nordic Territory, the Net Income will be split as follows:

| | |
|---|---|
| Composer (Lyricist/arranger): | 50% |
| Publisher: | 50% |

... of the Net Income.

## 9. Composer's Warranty

Composer warrants and represents to be in full possession of the rights transferred by virtue of this Agreement and warrants not to be already contractually engaged. Furthermore Composer warrants that said rights have not been assigned in whole or in part to other Third Party.

Composer warrants that subject titles do not infringe on any Third Party rights, whereas composer shall be subject to liabilities and damage claims in the event of not being in possession of said rights or in the event of infringement towards Third Party.

In the event that the Composer contemplates to enter into a cooperation with other composers in respect of the origin of a musical work, Composer warrants to advise Publisher of such cooperation, prior thereto, in order for Publisher to have the opportunity to enter into Publishing Agreement with these other composers.

Composer warrants to inform Publisher of all new compositions/productions and to inform Publisher of the splits of all relevant titles, which are subject to present Agreement.

## 10. KODA / NCB.

KODA and/or NCB or their affiliated societies abroad, account to Composer in respect of income arising out of the exploitation of subject titles hereto, according to the societies' rules and regulations concerning the repartition of income.

Publisher shall duly register the subject titles hereto in Composer's name and forward said registrations to the relevant Copyright societies NCB, KODA, and similar organisations.

Composer is obliged to provide Publisher with all relevant informations in respect of the titles subject to this Agreement, whereupon Publisher causes the notification and

registration of the work.

For what concerns the publishing splits for future works, which will be subject to present agreement, these must be given to Publisher prior to the release of these titles.

In the event that Composer subsequently wishes to alter the reported publishing splits, this must be done in accordance with clause 16.

Publisher is not liable for defaults incurred and caused by Composer's erroneous information.

After recoupment of advances from abroad in respect of sub-publishing agreements, accounting therefrom will be effected and handled directly through the local copyright bureau to NCB and KODA or any similar organisation, whereas Composer will receive all monies under such agreements directly from these bodies.

## 11. Publisher's Power of Attorney

Publisher shall be granted Power of Attorney to collect monies paid out pursuant to this Agreement on Composer's behalf, in the event of Publisher directly receiving monies from source that may be inclusive of payments to Composer.

## 12. Royalty Accounting

Publisher shall keep records of transactions under present Agreement.

Composer or Composer's designated representative in writing shall during normal business hours following a prior notification have access to the accounting department and the relevant pertinent documentation.

Provided that earnings on Composer's titles are registered, Publisher shall half-yearly no later than ninety (90) days following June 30th and December 31st forward a Statement of Accounting for respectively the first and second half-year. The accounting shall take place within the same period of time.

Publisher shall to the best of its efforts attempt to collect accounts due, but shall in no event be liable in respect of Composer for monies not received by Publisher.

## 13. Copyright Protection

Composer grants to Publisher the right to enforce and protect its rights in and to the subject compositions hereto and the right to joint legal action.

Said right is additionally granted to Third Party(ies), Publisher may have assigned rights to according to the

provisions of this Agreement.

## 14. TERM OF AGREEMENT

Present Agreement comes into force at the day of signing and will last for five (5) years thereafter. However, the Agreement is subsequently automatically extended for additionally one (1) year at a time, unless terminated in writing by a party at at least three (3) months notice.

Notwithstanding the aforesaid, if Composer has or will enter into Recording Agreement with Publisher's record company, Mega Scandinavia A/S, present Agreement will come into force on the date of the execution of the Recording Agreement retroactive from this date, and will last simultaneously until the termination of the Recording Agreement.

## 15. COPYRIGHT

Publisher shall retain the copyright for the life of Copyright (50 years at present, according to the Danish Copyright Act §63).

In the event of an extension of the copyright protection period or in the event that protection is extended otherwise, such extensions shall be incorporated in this Agreement without any separate agreement therefor. Such extension will not, however, change the remaining contents of present Agreement.

## 16. MISCELLANEOUS PROVISIONS

Alterations or addenda to present Agreement are not valid, unless in writing and signed by both parties.

Schedule A specifies, which titles are covered by this Agreement at the time of the execution hereof.

As an advance for the assignment as per this Agreement, Composer shall receive an initial amount of SEK 100.000.-- payable at the time of execution hereof. At the completion of Composer's forthcoming album with himself as an artist, Composer shall in receive SEK 50.000.-- as an additional advance. All advances shall be taken into consideration as advances against publishing income and shall thus be 100% recoupable from any and all income becomming due to Composer hereunder.

It is specificly understood and agreed that Composer at the time of the signing is already in receipt of publishing advances in the amount of approximately SEK 125.000.--, which are 100% recoupable in publishing income as well.

Both parties furthermore agree that this Agreement is quite unique and that it will not in any way set a precedent for other deals now existing or future ones.

FROM WARNER/CHAPPELL LEGAL & BUS. AFFAIRS     +02082229287     T-337  P 11/13  F-079

18-JAN-2000 20:47     ICR MANAGEMENT     +4604620616     S.09

23/09/99     09:10     MEGA :  DRDS - DENMARK + 0004607149397     NR.124     09

## 17. Breach of Contract

In the event that rma of the parties hereto shall willingly or knowingly be in considerable default of the provisions of this Agreement, then the other party shall be entitled to terminate this Agreement and to claim damages according to the damage claim stipulations of the Danish Copyright Act §56, subsection 1.

A default can only cause a Termination of this Agreement in the event that the party, wanting to claim the default, no later than 8 days after having been made acquainted with the default, forwards a written notice to the defaulting party, and the defaulting party shall have failed to cure the breach of contract within 14 days of receipt of such written notice detailing the default.

This Agreement shall not terminate in the event that one of the parties hereto, following extraneous events outside the control of such party, shall be refrained from performing according to the terms of this Agreement (the so-called "Force Majeure" Clause).

## 18. Jurisdiction

In the event of a controversy arising out of the interpretation of the stipulations of this Agreement or in the event of a breach, the controversy shall be adjudicated by Danish courts, namely Sø- & Handelsretten, Bredgade 70, D-1261 Copenhagen K.

A Schedule 1 is enclosed hereto with definitions that are an integral part of this Agreement. Schedule 2 specifies the titles, which are assigned at the time of execution and the schedule will be extended at the addition of future titles assigned.

Copenhagen, ____1/10 - 1996

_____
Megasong Publishing A/S

_____     _____
Composer / Harbert Crichlow     Witnesseth

From-WARNER/CHAPPELL LEGAL & BUS. AFFAIRS

10-JAN-2000 20:46    ICM MANAGEMENT
23/09/99    09:10    MEGA RECORDS - DENMARK → 0004687149357    NR.124    10

# SCHEDULE 1

## Definitions

The following definitions shall be applicable in respect of the interpretation of the stipulations contained in this Agreement:

### Album:

Meaning any phonogram not constituting a single. Previously, a black vinyl disc with 10 to 12 titles and currently a description of a vinyl record, a CD, a DAT, a.s.o., with 10 to 20 titles.

### Compensation for the use of mechanical rights:

Payment for the use of musical works through transfer and multiplication by mechanical reproduction, e.g. the mechanical transfer from a mastertape to a CD with the purpose of commercial trade and sale.

### Compilation:

A release whereon several different and individual artist titles are compiled on one album.

### Copyright:

Historically a British/American word describing the right of authors in respect of the exploitation of literary and artistic works.

### Copyright-period:

The period in which the author's copyright is protected against any Third Party use thereof. Presently the period is 50 (fifty) years, see The Danish Copyright Act, §46.

### Cover-version:

Re-recording of other artist's original material.

### Demo:

Test-recording, which is carried out in order for Third Party to valuate the quality of the material as a potential titel on a future single or album.

### Gramex:

Joint agency for producers of phonogram and practicing artists, which look after the collection of the lawful compensation, which need to be paid,

when phonograms and other sound-carriers is being used in radio and television or other public performances for commercial purpose.

**KODA:**

Organisation, which administers all public performance rights accorded to Danish and/or foreign authors and writers (originators).

**Mastertape:**

The original unit for reproduction of sound-carrying material.

**Masterowner:**

Firm or person, who owns the property right to the mastertape or other sound-carrying or videotape, which the recording of the artist has been stored on. This right includes the right to exploit the mastertape for commercial purpose.

**Merchandising:**

Commercial exploitation of artist name, logo and image s.o. in connection with sale and trade of goods and garments.

**NCB:**

Organisation, which administers all rights in connection to the mechanical recording of musical works on phonograms, tapes and videos. The organisation collects the mechanical compensation for the originators and distributes these accordingly.

**Originator:**

The original creator of musical works, e.g. a composer or a writer.

**Phonogram:**

Sound-carrying medium, such as CD, vinyl album, single, maxi-single, DAT, DCC, mini-disc, o.e.

**Public Performance Rights:**

The right to make use of a musical work in connection to personal appearances.

**Pro-rata numeris royalty:**

On compilations artist will only be in receipt of royalty according to the number of tracks represented on the compilation by this artist.

22-01-04  10:02   FROM-WARNER/CHAPPELL LEGAL & BUS. AFFAIRS   +02082229267   T-337  P.14/22  F-079

18-JAN-2000 20:46      IFP MONOGEMENT           1460462D616

23/09/99    09:10    MEGA I   RDS - DENMARK + 0004697143397                 NR.124    7.00
                                                                                      12

**Publisher:**

Firm or person to whom the originator has delegated
his tranferable copyrights, whereupon the Publisher
administers thade accordingly.
The delegation results in the fact that Publisher
has the exclusive right to multiplication and to
make the work accessible to the public.

**Re-mix:**



On the basis of an already existing mastertape a new
and different version of the musical work is
derived.

**Sample:**

Fragment of an original work, which none of the
parties of present agreement owns publishing to. The
fragment is used either singly or as a continuous
rhythm backing.

**Third Party:**

Legal entity or physical person that are not
identical to the parties of present agreement.

**Videograms:**

Audio-visual medium: videotapes, e.g. VHS,
VideoDisc, laserDisc s.o.



25-FEB-2004  11:00          020 8785 1960          98%                    P.15

**EXHIBIT B**

To the Declaration of Jane Dyball

Executed at London, England on this 20 day of September 2007

JANE DYBALL

<u>PUBLISHING AGREEMENT</u>

AGREEMENT made this ⌊t. Jиʌλαͼ........, 2002 by and between A LEMON GROOVE AB care of Mishcon de Reya Solicitors of Summit House, 12 Red Lion Square, London WC1R 4QD (hereinafter referred to as "Owner") and MUZIEKUITGEVERIJ ARTEMIS BV c/o WARNER/CHAPPELL MUSIC LTD, The Warner Building, 28 Kensington Church Street, London, W8 4EP (hereinafter referred to as "Publisher").

THE PARTIES AGREE AS FOLLOWS

1. Owner hereby designates Publisher to administrate the rights to and exploit the musical compositions set forth on Exhibit "A" attached hereto (hereinafter referred to as the "Subject Compositions") during the term and retention period for the territory of the world (hereinafter referred to as the "Licensed Territory"), and Publisher hereby accepts the rights and responsibilities set forth below with respect to the Licensed Territory:

(a) The exclusive right to manage and administer all rights of every kind, nature and description in and to the Subject Compositions, together with the right to manage and administer all copyrights and renewals or extensions thereof and the duty to employ best efforts in Publisher's reasonable business judgment and in accordance with the terms herein to protect Owner's rights in the Subject Compositions and to maximize the income therefrom.

(b)    (i) The exclusive right to issue licenses with respect to mechanical and electrical reproduction of the Subject

1

Compositions in the Licensed Territory on phonograph records, prerecorded tapes, piano rolls and transcriptions, or by any other method now known or hereafter devised for the reproduction of sound by any media whatsoever. However, the first mechanical license in respect of each previously unreleased Subject Composition shall be subject to Owner's prior written approval. Publisher will not issue mechanical licenses to subsidiaries or affiliates of Publisher at less than the prevailing statutory rate (or, where there is no statutory rate, at the rate prescribed by the local mechanical rights licensing society) at the time of release of phonograph recordings subject hereto.

(ii) Notwithstanding the foregoing, in the event that Herbert Crichlow enters into a producer agreement (including in respect of his services as a producer, mixer and/or remixer) which contains provisions which conflict with those herein contained, Owner agrees that PPublisher will be furnished with a copy of the relevant extract(s) of the producer agreement and will consult with the Publisher prior to concluding the producer agreement. Owner shall not suffer any royalty adjustments under this agreement if the producer agreement was concluded prior to the date hereof and/or the Publisher shall have approved the provisions of the producer agreement in writing which approval shall not be withheld if the provisions of the producer agreement are in line with current industry practices including by way of example so-called "Controlled Compositions" clauses in respect of exploitation in North America of the Controlled Compositions provided that the producer agreement does not: a) limit the mechanical royalty rate outside North America in any manner, (b) require the grant of free synchronisation or other licenses for any use other than promotional use for which no payment or payment below cost is received and/or (c) provide for the recoupment of any recording, marketing or other artist/producer cost from mechanical royalties.

(iii) Publisher shall have the right to collect all mechanical income derived from sales and uses of the Subject

2

Compositions on all records sold within the Licensed Territory during the term and retention period, regardless of where such records are manufactured.

(c) the exclusive right of public performance for profit (including broadcasting and television and via the internet) of the Subject Compositions and to license such rights in and for the Licensed Territory.

(d) Subject to Owner's prior written approval (which consent shall be subject to the rules and regulations of the relevant local collection society and /or to any blanket licences but which otherwise may be withheld at Owner's absolute discretion), the exclusive right to grant non-exclusive licenses for the recording and synchronisation of the Subject Compositions in and with motion pictures, television productions, commercials, video cassettes, video discs, computer games and/or programs and other audio-visual devices produced in the Licensed Territory, of making copies of the recordings thereof, and importing such copies into all countries of the world. Upon Owner's written request, Publisher shall grant a synchronisation licence in respect of a Subject Composition for any project and shall not in such instance charge synchronisation fees or other royalties other than in accordance with normal industry practice having regard to the project in question.

(e) The exclusive right to print, copy and otherwise graphically reproduce and to publish the Subject Compositions in any form and by any means whatsoever including electronic and/or digital reproduction (including albums, songbooks, folios or in compilations together with any other musical works) and the sole and exclusive right to sell, distribute, hire, lend to the public or otherwise dispose of such reproductions and copies in any form and by any means whatsoever.

3



(f) Subject to Owner's prior written approval (which consent shall be subject to the rules and regulations of the relevant local collection society and/or to any blanket licences but which may otherwise be withheld at Owner's absolute discretion), the exclusive right to arrange and adapt the Subject Compositions and to translate the lyrics and libretti thereof into all languages of the Universe and to make any changes and additions of new matter in the tiles, lyrics, text and music of the Subject Compositions. Where the same are licensed or authorised by the Publisher it shall use its best commercial endeavours to ensure that such The copyright in all such arrangements, adaptations translations, changes, and additions shall (subject always to applicable laws and the rules of mechanical and performing right societies in each territory of the Licensed Territory) be assigned to the Owner but the same shall be subject to the terms of this agreement. The remuneration of any arrangers, adaptors and translators shall be governed by the relevant rules of the performing right societies, mechanical right societies and other collection agencies to which they and/or Publisher, or its agent or licensee, shall belong. If no such rules are applicable then their remuneration shall be subject to prior approval from Owner.

(g) The nonexclusive right to use the name, approved image and approved likeness of, and approved biographical material concerning Owner in connection with Publisher's exploitation of the Subject Compositions. Approval of Owner's image, likeness and biographical material in accordance with this clause shall be deemed approved where the same has been provided by Owner in each instance of use and any such approval shall apply only in respect of the use stated in each instance. Publisher shall use its reasonable endeavours to procure that Owner is identified as the composer and/or author of the Subject Compositions.

(h) Publisher will prepare and file, in the name of Owner, all copyright forms and other documents required to be

4



filed in the Licensed Territory, and will file with the appropriate performing rights societies all documents required to be filed with said societies.

(i) Publisher shall have the right to collect, on Owner's behalf, all income derived in the Licensed Territory from sales and uses of the Subject Compositions prior to the term of this agreement, together with all such income earned during the term and extended term if any and during the retention period, provided that such royalties are actually paid to Publisher during the term, the extended term, the retention period or within 12 months from the expiry of the retention period. All monies received by Publisher following the 12 months from expiry of the retention period will be paid to Owner by Publisher in accordance with the terms hereof but subject to a maximum deduction by the Publisher of 5% and without regard to recoupment.

(j) Subject to Owner's prior written approval, the exclusive right to use and license others to use the title or tiles of the Subject Compositions for all purposes.

(k) Subject to Owner's prior written approval (which may be withheld at Owner's absolute discretion), the exclusive right to authorize any so called "sample" of any Subject Composition.

(l) Notwithstanding the above, Owner reserves to itself and its successors and assigns, and Publisher shall not be entitled to, nor have any right whatever with respect to:

(i) The exclusive right to dramatize the Subject Compositions in live performance or in any medium and to license the use and performance of such dramatic versions throughout the world.

(ii) The exclusive right to make literary versions of the Subject Compositions and to print, publish and vend such literary versions thereof throughout the world.

2.    (a) The term of this agreement shall commence as of the date hereof and terminate on June 30, 2005. If the advance stated in paragraph 16 or any other advance paid by Publisher to Owner hereunder is not fully recouped at the end of the term, then the term shall be automatically extended for consecutive six months periods until the advance is fully recouped. However, such automatic extension shall be limited to maximum eighteen (18) months , i.e. only up to and including December 31, 2006.

(b) Notwithstanding the foregoing, however, Owner shall have the right to terminate the term of this agreement at any time with effect from and after July 1, 2004  in the event that all advances paid to Owner hereunder are recouped including Pipeline Income. If the advance stated in paragraph 16 or any other advance paid by Publisher to Owner is not fully recouped including Pipeline Income as of July 1, 2004 or the date of termination thereafter, as applicable, Owner shall be entitled to terminate the term of this agreement by repaying  to Publisher one hundred and ten (110%) of the outstanding advance in which case the term shall end as at the previous 30th June or 31st December provided that such payment shall have been received by the Publisher no later than 30 days following the relevant date.  For the purposes of this agreement "Pipeline Income" shall mean a bona fide estimate of the Owner's share of income received and processed by the Publisher or its sub-publishing licensees in the UK, USA, Japan, Germany, France, Sweden and Italy, but not yet credited or paid to the Owner as at the relevant date.

(c) After the expiration of the term, regardless if terminated under subparagraph (a) or (b) above, Publisher shall have a five (5) year retention period in respect of  all Subject Compositions included in this agreement at the expiration of the term.

6

(d) As to printed editions of the Subject Compositions distributed commercially by Publisher during the term and the retention period hereof in adaptations, arrangements or translations thereof in the Licensed Territory, Publisher shall have the non-exclusive right to continue to sell off (subject to accounting to Owner in accordance with the terms hereunder) copies on hand at the expiration of Publisher's rights in the Subject Compositions(s) (as well as copies returned to Publisher) for a period of twelve (12) months thereafter ("Sell-Off Period"). Publisher shall not print, reprint or otherwise reproduce copies of said printed editions after the date of expiration of Publisher's rights in the Subject Composition(s), nor shall Publisher print, reprint or reproduce an excessive number of copies of any specific Subject Composition(s) in anticipation of the expiration of Publisher's rights therein.

3. (a) Owner shall deliver the Subject Compositions to Publisher in the form of either a lead sheet , or if recorded, a copy of the phonograph recording. Owner shall also deliver to Publisher all necessary information concerning each of the delivered Subject Compositions, such as the proper title, the names of the writers and writer splits and the name of the arrangement (if the work in its original form is in the Public Domain), and Publisher agrees that it will cause the copyright notice supplied by Owner to be printed on each copy of the Subject Composition(s) published in the Licensed Territory. In each instance, such delivery shall be made as soon as practicable after the subject materials are available to Owner. Owner further agrees to notify Publisher, in the manner provided below, of each recorded version of each of the Subject Compositions during the term hereof as soon as reasonably practicable following Owner's becoming aware thereof. If and to the extent that Owner fails to provide the materials and information set forth above, in addition to other rights and remedies available to Publisher, Publisher shall not be responsible for the noncollection of monies or the

lack of copyright protection with respect to the affected Subject Compositions in the Licensed Territory.

(b) Publisher shall promptly following Owner's request therefor deliver to Owner two (2) copies of each published edition of the Subject Compositions and two (2) copies of each local cover recording of each of the Subject Compositions.

(c) Owner agrees that it will not (other than reasonable numbers for personal use and not for sale) ship printed copies of the Subject Compositions into the Licensed Territory, except such copies as may be forwarded to Publisher pursuant to the terms hereof, and, to the extent permitted by law, it will not authorize anyone else to do so.

4. Publisher agrees to pay Owner the royalties set forth below as Owner's compensation (together with the advances contained in clause 16 herein) for the rights granted to and exercised by Publisher hereunder during the term and retention period:

(a) Fifteen percent (15%) of the suggested retail selling price ("SRSP") of each copy of each printed edition of the Subject Compositions (except inclusions in printed compilations and folios) sold in the Licensed Territory and not returned for which Publisher receives payment or credits against a previously received advance. Reasonable numbers of royalty-free professional copies of printed materials as well as reasonable numbers of copies distributed free for advertising purposes shall be royalty free.

(b) That proportion of fifteen percent (15%) of the SRSP of each copy of each printed compilation or folio sold in the Licensed Territory, and not returned, for which Publisher is paid or credited against a previously received advance, as the number of Subject Compositions bears to the total number of musical

8



compositions in said printed compilation or folio for which royalties are paid.

(c) Eighty percent (80%) of all sums received by Publisher (or credited to Publisher by way of recoupment of a previously paid advance) throughout the Licensed Territory, computed "at the source", from third-party print licensees.

(d) (i) Forty percent (40%) of the Publishing Share of all sums received by Publisher (or credited to Publisher by way of recoupment of a previously paid advance) for the Nordic Territory (Sweden, Norway, Denmark, Finland, Iceland, Estonia, Latvia and Lithuania), computed "at the source", by reason of the sale, license or other disposition of mechanical, electrical or electronic reproduction rights with respect to the Subject Compositions.

(ii) Sixty percent (60%) of the Publishing Share of all sums received by Publisher (or credited to Publisher by way of recoupment of a previously paid advance) for countries outside the Nordic Territory, computed "at the source", by reason of the sale, license or other disposition of mechanical, electrical or electronic reproduction rights with respect to the Subject Compositions.

(iii) For the avoidance of doubt it is hereby acknowledged and confirmed that the operation of sub-clauses 4(d)(i) and (ii) above shall entitle the Owner to receive a total of eighty per cent (80%) of all income accruing in respect of the sale, license or other disposition of mechanical, electrical or electronic reproduction rights with respect to the Subject Compositions including the percentages of the Publishing Share payable by Publisher (as set out herein) and direct payments to Owner and to Herbert Crichlow by collection societies or otherwise (but not by Publisher hereunder) of Owner's and Herbert Crichlow's share of such income. In the event that the Publishing Share as defined in clause 4(i) herein is changed or amended then all

9

percentages will be adjusted as necessary to ensure that the Owner continues to receive a total of eighty per cent (80%) of all income as referred to in this sub-clause.

(e)    (i) Forty percent (40%) of the Publishing Share of all public performance income received by or credited to Publisher (or credited to Publisher by way of recoupment of a previously paid advance) for the Nordic Territory, computed "at the source".

(ii) Sixty percent (60%) of the Publishing Share all public performance income received by Publisher (or credited to Publisher by way of recoupment of a previously paid advance) for countries outside the Nordic Territory, computed "at the source".

(iii) For the avoidance of doubt it is hereby acknowledged and confirmed that the operation of sub-clauses 4(e)(i) and (ii) above shall entitle the Owner to receive a total of eighty per cent (80%) of all public performance income accruing with respect to the Subject Compositions including the percentages of the Publishing Share payable by Publisher (as set out herein) and direct payments to Owner and Herbert Crichlow by collection societies or otherwise (but not by Publisher hereunder) of Owner's and Herbert Critchlow's share of such income. In the event that the Publishing Share as defined in clause 4(i) herein is changed or amended then all percentages will be adjusted as necessary to ensure that the Owner continues to receive a total of eighty per cent (80%) of all income as referred to in this sub-clause.

(f)  Seventy-five percent (75%) of all sums received by PPublisher (or credited to Publisher by way of recoupment of a previously paid advance) throughout the Licensed Territory, computed "at the source", from synchronization licenses granted by Publisher.

(g) Seventy-five percent (75%) of any other sums received by Publisher (or credited to Publisher by way of recoupment of a previously paid advance) throughout the Licensed Territory,



computed "at the source", from sales, uses or other exploitation of the Subject Compositions not specifically described above.

(h)  in the event that the Publisher or its sub-publishing licensees receive any monies in respect of payments and distributions by any mechanical right society which makes such payments and distributions by way of specific rebates of society commissions previously deducted in accordance with the terms hereof, (including, but without limitation, the so-called "Restausschutung" payments by GEMA in Germany and by way of newly introduced types of distribution (including, without limitation, distributions of levies on blank audio tapes and on audio recordings/playback equipment)), then the Publisher shall account to the Owner in accordance with the provisions of this agreement for sums equivalent to that fraction of 80% (eighty percent) of the total of such receipts aforesaid from each such society distribution the numerator of which fraction shall be the mechanical royalty distribution for the relevant accounting period in which the payment was received from the society concerned to the Publisher or its relevant sub-publishing licensee which is clearly and identifiably attributable by title to the exploitation of the Subject Compositions and the denominator of which is the total mechanical royalty distribution for the relevant accounting period from the society concerned to the Publisher or its relevant licensee which is clearly and identifiably attributable by title to the exploitation of all musical compositions (including the Subject Compositions) controlled by the Publisher or its relevant sub-publishing licensee as the case may be.

(i) References to the computations "at the source" of sums or fees received shall be deemed to refer to income actually collected from record companies, mechanical licensing societies, performing rights societies or other users in a specific country of the Licensed Territory, after deduction of local society fees and other collection society costs but without deduction



therefrom of any portion of said sums or fees by foreign affiliates, subpublishers, licensees or agents of Publisher. The "Publishing Share" shall mean thirty-three point three percent (33.3%) of mechanical royalties and public performance fees for the Nordic Territory and fifty percent (50%) of mechanical royalties and public performance fees for countries outside the Nordic Territory.

(j) To the extent that Owner has been or may hereafter be paid by Publisher, Owner agrees to pay the writer(s) of the Subject Compositions and any co-publishers or participants from or through whom Owner derives any rights licensed to Publisher hereunder all royalties or other money required to be paid to them as their contractual share of the royalties received by Owner hereunder, and Owner agrees to indemnify Publisher and hold Publisher harmless from and against any claims or demands by such third parties for such payment, in accordance with paragraph 5(d), below.

(k) In the event and to the extent that Publisher is prevented from paying any monies hereunder due to currency restrictions, Publisher shall so notify Owner, and Owner shall have the right, by notice to Publisher, to elect to accept payment of such monies in foreign currency in a depository selected by Publisher, and if Owner shall so elect, Publisher shall at Owner's sole cost and expense promptly deposit or cause to be deposited all such payable monies to the credit of Owner in such foreign currency and shall promptly give Owner written notice of said deposit. Payment so made to the depository so elected by Publisher shall fulfill Publisher's obligations hereunder as to the monies so payable to Owner.

5. (a) Owner hereby warrants and represents that it has the right to enter into this Agreement and to grant to Publisher all of the rights granted herein, and that the exercise by PPublisher of any and all rights granted to Publisher in this Agreement, in

12

accordance with the terms of this Agreement, will not violate or infringe upon any common law or statutory rights of any person, firm or corporation, including, without limitation, contractual rights, copyrights and rights with respect to name and likeness. The rights granted herein are free and clear of any claims, demands, liens or encumbrances, to the best of Owner's knowledge and belief.

(b) Owner and Herbert Crichlow hereby warrant and undertakes that all songs, including music and/or lyrics, written by Herbert Crichlow during the term hereof shall be included in this agreement.

(c) At the request of Publisher, Owner shall establish a catalogue name for the Subject Compositions, which shall be used for collecting society registrations, copyright notices etc. Such catalogue name shall be registered by Publisher, with any necessary assistance from Owner and/or Herbert Crichlow, with STIM for publisher membership.

(d) Each party hereby indemnifies and agrees at all times to save the other party harmless against any loss, damage, cost or expense (including reasonable third party attorney's fees and court costs) incurred by reason of any adverse claim, action or proceeding made or brought by others in and to the Subject Compositions or to any part thereof, which results in a final court judgment or which is settled with the other party's prior written consent. The indemnitee shall give the indemnitor prompt notice thereof in each instance, and the indemnitor shall have the right to participate in any such action at its own expense. Pending disposition of any adverse claim commenced where Publisher is the indemnitee, Publisher shall have the right, upon prior written notice to Owner, to withhold from the monies otherwise becoming due and payable to Owner an amount bearing a reasonable relationship to the scope of Owner's indemnity with respect to such claim; provided that any amount so withheld shall be released

13



together with accrued interest thereon if (and to the extent that) formal legal proceedings shall not have been commenced with respect thereto in a court of competent jurisdiction within one (1) year following such withholding; provided further that Publisher shall not so withhold if (and to the extent that) Owner shall furnish Publisher with a commercial surety bond issued by a company (and in a form) satisfactory to Publisher. In the event that Owner refuses to consent to a proposed settlement which Publisher considers reasonable, Owner shall thereupon assume the defense of the subject claim, action or proceeding at Owner's expense. Any and all sums incurred by Publisher in the defense of any indemnifiable claim, action or proceeding shall (in addition to any other remedies available to Publisher) be deemed at all times to be an expense chargeable against royalties payable hereunder. Those sums recovered by the Publisher by way of damages or otherwise shall be credited 80% (eighty percent) to the Owner's royalty account and 20% (twenty percent) retained by the Publisher in the percentages referred to in clause 4 of this agreement in accordance with the relevant use in question after the deduction of reasonable agreed third party legal expenses. Any money withheld by Publisher and released to Owner in accordance herewith shall be included in the Publisher's royalty accounting for the accounting period following the date of such release but shall not be used to recoup any advance paid after the date the withholding was made.

6. Publisher shall not assign or transfer this entire agreement except to a corporate parentor subsidiary , an entity into which or with which Publisher may merge or consolidate, or a purchaser of substantially all of Publisher's stock or assets. However, in the event that the Licensed Territory includes more than one country, Publisher may sublicense all of its rights under this agreement for each country of the Licensed Territory.

7. (a) Publisher shall compute the royalties earned by Owner pursuant to this agreement within sixty (60) days following the

14

end of each semiannual calendar period during which gross receipts are received (or finally credited) with respect to the Subject Compositions, and shall thereafter promptly submit to Owner the royalty statement for each such period together with the net amount of royalties, if any, which shall be payable after deducting any and all unrecouped advances and chargeable costs under this agreement.

(b) Each statement submitted by Publisher to Owner shall be binding upon Owner and not subject to any objection by Owner for any reason unless specific written objection, stating the basis thereof, is sent by Owner to Publisher within three (3) years after the date said statement is submitted to Owner. Owner or a certified public accountant on Owner's behalf may examine the books of Publisher pertaining to the Subject Compositions upon thirty (30) days' notice in each instance at Publisher's place of business during Publisher's usual business hours, but not more than once during each consecutive twelve-month period from the commencement of the term of this Agreement. Said books relating to activities and receipts during any accounting period may only be examined as aforesaid during the three (3)-year period following receipt by Owner of the statement for said accounting period. For the purpose of calculating the time period for audits and legal action by Owner, a statement shall be deemed to have been received thirty (30) days after the same is due (being sixty (60) days following the end of each accounting period) unless, within such thirty (30) day period, Publisher shall receive notice of nonreceipt of such statement from Owner. However, Owner's failure to give such notice shall not affect Owner's right to receive such statement (and any accompanying payment) thereafter and any delay in receipt by Owner of such statement shall extend the periods referred to in this subclause by such period of delay. All cost of any audit of Publisher's books and records shall be paid by Owner, provided, however, that if it shall be finally determined that an underpayment greater than ten percent (10%) of the total royalties paid by Publisher to Owner for the period audited has occurred,

all reasonable costs of such audit (excluding the cost of travel and/or subsistence) shall be paid on a non-recoupable basis in addition to the amount of such agreed underpayment by Publisher, not to exceed an amount equal to the amount of the underpayment.

(c) Publisher shall use its best endeavours consistent with reasonable business judgment to collect promptly and fully all sums due to Publisher in respect of exploitation and/or use of the Subject Compositions. However, and notwithstanding any provision to the contrary herein contained, monies hereunder shall only be payable by Publisher to Owner with respect to gross receipts actually received in Sweden or amounts finally credited to Publisher's account.

(d) Legal action by Owner with respect to a specific accounting statement and/or accounting period to which the same relates shall be forever barred if not commenced in a court of competent jurisdiction within four (4) years after such statement is rendered.

(e) In the event Publisher shall be obligated by the laws of any country of the Licensed Territory to declare and withhold income, corporate or other similar taxes from royalties or other monies payable to Owner hereunder, Publisher shall use its best endeavours to obtain a tax credit and in the event that Publisher receives a tax credit attributable to royalties or other monies due to Owner then Publisher shall credit the applicable share attributable to such royalties or other monies to the Owner's royalty account hereunder. In the event that Publisher does not receive a tax credit Publisher shall furnish to owner with each accounting statement the details of the amount of tax which shall have been withheld, the rate of tax and any other necessary information which may be required to enable Owner to apply to obtain tax credit for the tax so withheld. However, Publisher does not thereby warrant or represent the availability of such credit. Upon request, Publisher shall execute such further documents as

16

may be required to enable Owner to complete its application for such credit. Publisher shall not be entitled to use any share of Owner's royalties or monies so credited to recoup any advance paid to Owner after the date that such sums were originally withheld.

8. Owner grants to Publisher the non-exclusive right but not the obligation to enforce and protect Owner's rights in the Subject Compositions in the Licensed Territory, including the institution of suits and proceedings in the name of Owner, and further including the right to enter into settlements and compromises in connection therewith, provided, however, that Publisher shall first obtain Owner's written approval and consent with respect to any such action by Publisher (including the institution of suits and/or proceedings) and to any such settlement or compromise.

9. This agreement shall be binding upon the respective parties, their successors and assigns, and shall be governed by and interpreted in accordance with the laws of England and Wales. The High Court in London shall have exclusive jurisdiction.

10. Intentionally deleted.

11. (a) The respective addresses of Owner and Publisher for all purposes of this agreement shall be as set forth above until notice of a new address shall be duly given. Any notice shall be in writing and shall be delivered by hand (to an officer if the addressee is a corporation), or sent by registered mail, postage prepaid, return receipt requested, with all charges prepaid, provided that any royalty statement may be sent by regular mail. Properly addressed notices delivered or sent as provided herein shall be deemed given when delivered by hand, or three (3) days after the date the same is postmarked if delivered by mail. A copy of all notices to the Owner or Herbert Crichlow shall be simultaneously be forwarded to Miscon de Reya Solicitors, Summit House, 12 Red Lion Square, London WC1R 4QD and marked for the attention of Adam Van Straten provided that any failure to do so shall not invalidate any notice otherwise validly given.

17

(b) Where required, the consent or approval of a party shall not be unreasonably withheld (unless such consent and/or approval may be withheld at Owner's discretion as specified herein) and shall be deemed to have been granted in any instance (unless the same may be withheld at Owner's discretion as specified herein) in which the same is not specifically withheld by notice to the other party within fifteen (15) days following the date of notice requesting such approval or consent. For the avoidance of doubt any consent and/or approval required by Publisher and which Owner may withhold at its absolute discretion shall require Owner's specific consent and/or approval and shall not be deemed approved in accordance with this sub-clause 11(a).

12. A waiver by either party of any term or condition of this agreement shall not be deemed or construed to be a waiver of such term or condition for the future. All remedies, rights, undertakings and obligations contained in this agreement shall be cumulative and none of them shall be in limitation of any other remedy, right, undertaking or obligation for either party. This agreement may not be modified, amended or terminated, nor may any provision be waived, except by written instrument signed on behalf of both parties hereto.

13. Nothing herein contained shall be construed to constitute a partnership or joint venture between the parties hereto, and neither party shall become bound by any representation, act or omission of the other. Publisher in all its dealings hereunder is an independent contractor.

14. Printed editions of the Subject Compositions published in the Licensed Territory shall bear such copyright notice as shall be prescribed by Owner by notice to Publisher, which notice shall be printed at the bottom of the title page or first page of music of each such edition. Such edition shall be published in accordance with applicable copyright laws, including the Berne Convention and the Universal Copyright Convention. Any printed



edition embodying the Subject Compositions published in the Licensed Territory which does not conform to the aforesaid requirements shall be deemed to have been published without the authority of Owner. However, in the event of the inadvertent omission of such notice by Publisher and/or its sublicensees, the same shall not constitute a breach by Publisher of this agreement sufficient to justify a termination of the term hereof (but the foregoing shall not limit Owner's right /if any/ to recover monetary damages due to such omission) and provided that such omission is rectified as soon as commercially viable upon notice to or knowledge of such omission to or by Publisher .

15. This agreement shall not be deemed to give any right or remedy to any third party whatsoever unless said right or remedy is specifically granted to such third party by the terms hereof. Neither party shall be deemed to be in breach hereunder unless notice of breach shall have been given in the manner prescribed herein and the notified party shall fail to remedy such alleged breach within thirty (30) days (fifteen (15) days in respect of payment to Owner by Publisher of sums due to Owner hereunder) after receiving such notice (unless the alleged breach is of such a nature that it cannot practicably be completely remedied within such thirty (30) day period, in which event the party in breach shall be deemed to have timely remedied such alleged breach if it commences to do so within such thirty (30) day period and proceeds to complete the remedying thereof within a reasonable time thereafter).

16. (a) Publisher shall pay to Owner the following sums as advances fully recoupable from all royalties payable to Owner hereunder and against all writer's share royalties payable by STIM, NCB and other collecting societies to Herbert Crichlow, as well as against royalties stated in subparagraphs (b) and (c) below:

(i) Thirteen million, seven hundred and eight five thousand nine hundred and thirty Swedish kronor

19



(13,785,930 SEK) less the amount of one million five hundred and nine thousand seven hundred and eighty seven Swedish kronor (SEK 1,509,787,00) previously received by Owner, namely twelve million, two hundred and seventy six thousand one hundred and forty three Swedish kronor (12,276,143 SEK) upon execution of this agreement.

(ii) A rolling advance of seven million seven hundred and thirty thousand kronor (SEK 7.730.000) payable upon recoupment of the initial advance, and thereafter upon each recoupment of the previous advance. Any calculation of the balance of Owner's royalty account undertaken in order to ascertain whether or not any rolling advance is payable shall include a calculation of pipe-line income received by Publisher or the Warner/Chappell local affiliate in the UK, USA, Canada, Germany, Austria, Switzerland, France, Italy, Japan, Australia, Belgium, the Netherlands and Luxemburg. Notwithstanding the foregoing, Publisher shall not pay any one rolling advance of seven million seven hundred and thirty thousand Swedish kronor (SEK 7.730.000,00) in the event that Owner notifies Publisher upon recoupment of the initial advance or subsequent advance(s) (as applicable) that Owner does not wish such additional rolling advance to be paid (which such notification shall apply in each instance only and shall not act as a waiver of Owner's right to receive such rolling advance at a subsequent date upon Owner's written request to Publisher). Publisher shall not be obliged to pay any rolling advance to Owner after December 31, 2004.

(iii) Advance payment under (i) and (ii) shall be paid after Publisher's receipt of invoice from Owner in each case.

(iv) No advances paid to Owner or on Owner's behalf following the end of any semi-annual accounting period may be recouped from royalties

20



and/or monies otherwise payable to Owner in respect of such semi-annual accounting period. No advance shall be pre-paid unless specifically requested by the Owner and in the event that any advance is pre-paid other than at Owner's specific request then for the purposes of recoupment and otherwise such advance shall be deemed paid on the due date.

(b) Publisher shall be entitled to collect and receive all Owner's and/or Herbert Crichlow's royalties due from time to time from Air Chrysalis Scandinavia AB. Ninety-five percent (95%) of such royalties received by Publisher shall be credited to Owner's royalty account hereunder and paid to Owner upon recoupment by Publisher of such account from time to time. The remaining five percent (5%) shall be Publisher's share of such royalties. Owner and Herbert Crichlow shall confirm in writing to Air Chrysalis Scandinavia Publisher's right to collect and receive such royalties.

(c) One hundred per cent (100%) of royalties due to Herbert Crichlow from time to time under Herbert Crichlow's publishing agreement with Mega Songs A/S (owned by Warner/Chappell Music) shall be credited to Owner's royalty account hereunder and paid to Owner upon recoupment by Publisher of such account from time to time.

(d) Herbert Crichlow shall confirm in writing Publisher's right to collect 100% of mechanical royalties and the writer's share of performing fees to STIM, NCB and any record company, mechanical licensing society, performing rights society or other users.

IN WITNESS WHEREOF, the parties hereto have caused this agreement to be executed the date and year hereinabove set forth.

21



For A LEMON GROOVE AB

and HERBERT CRICHLOW

By _____

For   MUZIEKUITGEVERIJ   ARTEMIS
BV

By _____

22

EXHIBIT "A"

Annexed to and made part of the following Agreement:


Date: Owner: A Lemon Groove AB
Publisher:  Muziekuitgeverij Artemis BV

The term "Subject Compositions" as used in this agreement shall mean all musical compositions written by Herbert Crichlow and presently owned and controlled by Owner, and all musical compositions hereafter so written and owned and so controlled by Owner during the term of this Agreement with respect to which Owner is possessed of the rights herein granted to Publisher for the Licensed Territory.


Publisher has agreed with Air Chrysalis Scandinavia that Herbert Crichlow's share of the song "Sensitive" shall be 50% controlled by Publisher under this agreement and 50% controlled by Air Chrysalis Scandinavia. Publisher also has agreed with Air Chrysalis Scandinavia that Herbert Crichlow's share of the songs embodied on the first album by NG3 will be 100% controlled by Air Chrysalis Scandinavia. Publisher is satisfied that the term of Herbert Crichlow's publishing agreement with Air Chrysalis Scandinavia dated 20 January 1999 has expired and that Herbert Crichlow and Owner are free to enter into this agreement.


Publisher also acknowledges that Herbert Crichlow's share of any songs written prior to December 31, 2001 commercially released or to be commercially released by the project Popstars (Swedish version) are 100% controlled by Air Chrysalis Scandinavia and that any songs written after January 1, 2002 commercially released or to be commercially released by the aforesaid Popstars project will be 50% controlled by Publisher under this agreement and 50% controlled by Air Chrysalis Scandinavia.

23



Publisher confirms that Publisher is aware of and supports and will continue to support the audit of Zomba currently being carried out jointly by Herbert Crichlow and Mega Songs A/S. Any sums due to Herbert Crichlow and/or Owner resulting from such audit shall be paid in full directly to Herbert Crichlow after deducting the costs of the audit but without any deductions by Publisher and without regard to recoupment of Owner's royalty account hereunder but subject to recoupment of any unrecouped advances paid to Herbert Crichlow by Mega Songs A/S.

For A LEMON GROOVE AB
AND HERBERT CRICHLOW

By _____

For MUZIEKUITGEVERI
ARTEMIS BV

By _____

J:\Legal\CONTRACT\DRAFTS\MUSIC\herbie.DOC

24

LETTER OF INDUCEMENT

From:  Herbie Crichlow
C/o Mishcon de Reya Solicitors
Summit House
12 Red Lion Square
London WC1R 4QD

To:  Muziekuitgeverij Artemis BV
Warner/Chappell Music Publishing Limited
Griffin House
161 Hammersmith Road
London W6 8BS

Dated:  As of 1st July 2002

Dear Sirs

Reference is hereby made to an agreement of even date herewith ("the Publishing Agreement") between A Lemon Groove AB ("the Company") and you whereby the Company agrees, inter alia, to grant to you certain rights in and to musical works written and/or composed by the undersigned.

In consideration of the payment to me by you of one pound (£1) (receipt of which I hereby acknowledge) and as an inducement to you to enter into the Publishing Agreement (it being to my benefit as a writer and/or composer of musical works that you execute the same) and as a material part of the consideration moving to you for so doing, the undersigned hereby represents, warrants and agrees that:

(1)  I have heretofore entered into an agreement ("the Songwriting Agreement") with the Company whereby the Company is exclusively entitled, inter alia, to my services as a writer and/or composer of musical works during a period not less than the Term of the Publishing Agreement and any extensions thereto, and to the rights in the "Compositions" (which term shall, for the purposes of this Letter, have the same meaning as defined in the Publishing Agreement) for at least the duration of the Rights Period of the Publishing Agreement;

(2)  I am familiar with each of the terms, covenants and conditions of the Publishing Agreement and hereby approve and consent to the execution thereof. I confirm that the Company has the right and authority to enter into the Publishing Agreement and to grant to you the rights thereby granted in and to the Compositions upon the terms and conditions and for the periods therein specified. I further confirm that there have been granted to the Company by me all of the rights which the Company requires from me to grant to you the rights granted by the Company under the Publishing Agreement;

(3)  I am under no obligation or disability by law or otherwise which would prevent or restrict me from performing and complying with all of the terms, covenants and conditions of the Publishing Agreement insofar as the same relates to the Compositions;

(4)  Subject to your compliance with your obligations to the Company pursuant to the Publishing Agreement, I will look solely to the Company and not to you for all compensation and other remuneration for any and all services and rights which I render



and grant pursuant to the Songwriting Agreement to enable the Company to comply with the Publishing Agreement. No breach by the Company of the Songwriting Agreement shall be sufficient cause for my failure or refusal to perform and comply with such Agreement so as to enable the Company to comply with the Publishing Agreement;

(5)     if the Company should enter into liquidation or be dissolved or should otherwise cease to exist or if the Company should fail, be unable, neglect or refuse to perform and comply with each and all of the terms, covenants and conditions of the Publishing Agreement requiring performance or compliance on its part, or in the event that for any reason the Company shall cease to be entitled to my services pursuant to the Songwriting Agreement and/or to any rights in any Compositions, then I shall at your request do all such acts and things and execute any and all such documents as shall give to you the same rights, privileges and benefits as you would have had under the Publishing Agreement in respect of my services and/or the Compositions if the Company had continued to perform and comply with the terms and conditions thereof. Such rights, privileges and benefits shall be enforceable on your behalf against me, and all the terms and conditions contained in the Publishing Agreement shall be effective (including the recoupment from royalties of all advance payments paid by you to the Company). Nevertheless, you shall not be obliged after such request and by reason of the provisions of this paragraph to pay to me and/or any other writers or composers the subject of the Publishing Agreement royalties and other monies which in aggregate exceed the royalties and other monies which you would have had to pay to the Company had the Company continued to perform its obligations to you under the Publishing Agreement. In any event, I will not hold you liable for any monies, royalties and fees due to me pursuant to the Songwriting Agreement which monies have been paid by you to the Company pursuant to the Publishing Agreement prior to the date of such request. After the date of such request, all Compositions shall thereafter be delivered by me directly to you in accordance with the terms of the Publishing Agreement and you will account to me and not to the Company (subject to recoupment as aforesaid) for monies, royalties and fees which would otherwise be payable to the Company in respect of the use and/or exploitation of the Compositions and you will pay to me and not to the Company all advances otherwise payable to the Company after the date of such request. The foregoing provisions of this paragraph shall be to the same extent and with the same force and effect as if I were a direct party to the Publishing Agreement in the first place and as if in such Publishing Agreement I had personally agreed to grant to you the rights therein provided to be granted in and to the Compositions and to perform and observe each and all of the conditions of the Publishing Agreement in respect thereof save that you shall not be afforded any greater rights than those embodied in the Publishing Agreement with the Company;

(6)     in the event of a breach or threatened breach of the Publishing Agreement by the Company or of this Agreement by me, you shall be entitled to seek legal and equitable relief by way of injunction or otherwise against the Company and/or against me in your discretion and without the necessity of your first resorting to or exhausting any rights or remedies which you may have against the Company;

(7)     any permitted assignment by you (pursuant to the Publishing Agreement) of the Publishing Agreement shall constitute an assignment of this Agreement to such assignee and I hereby consent to any such permitted assignments;

I agree to indemnify and hold you harmless from and against any liability, loss, damage, cost or expense (including reasonable legal costs) paid or incurred by you by reason of any breach by me of the representations, warranties or agreements contained herein or in the Songwriting Agreement or in the Publishing Agreement save that the foregoing indemnity shall only apply in relation to the final judgements of a court of competent jurisdiction or a settlement made with my prior consent;

(9)    for the purposes of the Data Protection Act 1998, as amended, I hereby agree and consent to the holding and processing of personal data provided by me to you for all purposes relating to the Publishing Agreement including without limitation relating to the processing collecting and payment of royalties throughout the Territory thereof;

(10)    I have prior to the date hereof sought independent specialist advice to enable me fully to understand the obligations hereby entered into.

**IMPORTANT**

THIS AGREEMENT WILL VITALLY AFFECT YOUR SONGWRITING CAREER - PERHAPS FOR SEVERAL YEARS. BEFORE SIGNING, PLEASE OBTAIN EXPERT PROFESSIONAL ADVICE FROM SOMEONE WHO IS FAMILIAR WITH THIS TYPE OF AGREEMENT.

Yours faithfully                        Acknowledged and Agreed

.......................                ......................... and ...........................
**HERBIE CRICHLOW**            for and on behalf of
                                              **MUZIEKUITGEVERIJ ARTEMIS BV**

In consideration of the sum of £1 (one pound), receipt of which is hereby acknowledged, this Company hereby acknowledges and (insofar as they affect this Company) agrees to the terms of this Letter.

.......................
for and on behalf of
**A LEMON GROOVE AB**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
HERBERT ST. CLAIRE CRICHLOW,    )
                                                    )          Civil Action No. 07-01622 (HHK)
            Plaintiff,                           )
                                                    )
            v.                                     )
                                                    )
WARNER MUSIC GROUP CORP.,      )
                                                    )
            Defendant.                        )
_____ )

**[PROPOSED] ORDER**

This Court having carefully reviewed the submissions of the parties pertaining to the

Motion by Defendant Warner Music Group Corp. to Dismiss the Complaint, it is this _____ day

of _____ 2007, hereby ORDERED that Defendant's Motion to Dismiss be granted, and that

Plaintiff's Complaint be and hereby is dismissed.

_____
HONORABLE HENRY H. KENNEDY, U.S.D.J.